**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

VC MACON GA, LLC,

        **Plaintiff,**

  v.

                                  **Civil Action No. 18-CV-00388-TES**

VIRGINIA COLLEGE, LLC and
EDUCATION CORPORATION OF
AMERICA,

        **Defendants.**

## EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER AND ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

COMES NOW DEFENDANT VIRGINIA COLLEGE, LLC ("Defendant"), its PARENT DEFENDANT EDUCATION CORPORATION OF AMERICA, and its AFFILIATE NEW ENGLAND COLLEGE OF BUSINESS AND FINANCE, LLC (collectively, "ECA" or "Debtors"), by and through counsel, and move this Court immediately to appoint a Federal Receiver ("Receiver") to oversee the affairs of ECA and for the entry of a Temporary Restraining Order and Preliminary Injunction and state as follows.

## INTRODUCTION

Because of the exigent circumstances that are present in this specific matter, as well as in the affairs of Defendants in general (as more fully described below), Defendants file this Emergency Motion for the Appointment of a Receiver and the entry of a Temporary Restraining Order and Preliminary Injunction (the "Emergency Motion") to seek immediate relief so as to prevent irreparable harm to ECA's institutions, which are in grave danger of being abruptly shut

1

down by creditors such as VC Macon GA, LLC ("Plaintiff"), thereby unnecessarily interrupting and/or disrupting the educational missions of ECA's institutions and its students. The Receiver appointed by this Court will be empowered through obtaining additional credit to preserve ECA's educational mission and the Temporary Restraining Order and Preliminary Injunction will prevent the unnecessary disruption of the Receiver's work, allow the students to pursue their educational plans without undue interruption and also preserve assets and maximize any potential return to ECA's creditors, including Plaintiff, through the going concern sale of the Go-Forward Schools, defined below.

Defendants request that the Court enter an order appointing the Receiver that will contain input from Plaintiff, Defendants and interested third-parties, if any. Defendants propose that the order provide for (a) the appointment of a receiver of ECA to do all the things which the board and management of ECA may do in the exercise of ordinary business judgment or in the ordinary course of the operation of ECA's business as a going concern and take and maintain full possession of all its property to facilitate the administration of its business and an orderly implementation of the restructuring plan outlined herein to ensure that ECA's assets are put to their best use in service to its schools, students and creditors and (b) for the entry of a Temporary Restraining Order and Preliminary Injunction restraining and enjoining the commencement or continuation of any judicial, administrative, or other action or proceeding against ECA that was or could have been commenced before the entry of the order of appointment, or to recover a claim against the debtors that arose before the entry of the order of appointment, the enforcement of any judgment against ECA obtained before the entry of the order of appointment, including any action to obtain possession of ECA's property or dispossess ECA from any possessory interest.

# I.    FACTS

## A.    Background

ECA's revenues flow almost exclusively from tuition and fees paid by its students, a significant majority of whom utilize federal grants and student loans provided under the Higher Education Act of 1965 (the "HEA"), 20 U.S.C. § 1001 *et seq.  See Declaration of Michael Ranchino ("Ranchino Declr.") at* ¶ 6, attached hereto as **Exhibit 1**. Like most career colleges, ECA's student population largely comprises nontraditional students, such as unemployed or underemployed adults, who are seeking to obtain job skills in order to find employment or to change careers.

Enrollment in many of ECA's campuses has been falling for several years. *Id.*  The decline in enrollment can be attributed to numerous regulatory and macroeconomic factors, including: the previous Administration's decision to remove the federal recognition of the Accrediting Council for Independent Colleges and Schools ("ACICS"), the agency that accredits nearly all of ECA's institutions, which required ECA to advise potential students of potentially dire consequences if ECA was unable to obtain alternate accreditation within a specified time frame, thereby causing some potential students to choose not to enroll or remain enrolled; and the recent upturn in the business cycle that has lowered the unemployment rate to historic levels, so that more of the nontraditional students typically enrolled in ECA's institutions are able to find employment without the need for more education or training. *Id.*

ECA has four campuses and a substantial portion of its staff located in Georgia.  There are approximately 1163 students pursuing academic programs across the four campuses, with approximately 828 students attending Go-Forward Schools and 335 students attending Teach-Out Schools.  ECA has approximately 251 employees in Georgia directly supporting the students and campuses. *Id. at* ¶ 10.

**B.** **Financial Issues and Current State of Claims**

Consistent with trends in career education enrollment, ECA's institutions' student populations have declined significantly in recent years. Because ECA's revenues are produced almost entirely by tuition and fees paid by students, the enrollment decline has negatively impacted ECA's financial condition and cash flow, such that ECA for months has not been able to timely service all of its financial obligations or timely meet its payables. ECA has been focused on marshaling its dwindling financial resources to maintain its campuses and its educational programs and services for its students. *Ranchino Declr. at* ¶ 11.

**i.** **ECA Landlord Obligations**

As of October 5, 2018, ECA had unsecured debt owing to 1,033 vendors and landlords amounting to approximately $46,773,000. *Id. at* ¶ 12. In the ordinary course of its business, ECA's institutions lease real estate to operate at their various campuses and headquarters. A list of ECA's institutions' leased real estate is contained in **Exhibit 2**, which is attached hereto and incorporated by reference herein. *Id. at* ¶ 13. Several ECA campuses are presently the subject of landlord actions to recover on alleged claims for monetary judgments, which are ongoing, as well as to dispossess ECA from possession of such campuses, and ECA is a party to other ongoing commercial and employment litigation and arbitration proceedings.[1]

---

[1] On October 16, 2018, ECA filed a Declaratory Judgment action against the Department of Education ("DOE") in the United States District Court for the Northern District of Alabama (Case No. 2:18-cv-01698-AKK) seeking a declaration that the restructuring plan contemplated by ECA (described herein) would not interfere with the access and eligibility of ECA institutions that are expected to continue operating in the ordinary course under the restructuring plan, and the students attending those institutions, to benefits under Title IV of the Higher Education Act of 1965 (the "HEA"), including the ability to participate under the HEA student financial aid programs by any successor to ECA. ECA also filed an Emergency Motion for the Appointment of a Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction. After entering a TRO in favor of ECA, on November 5, 2018, the Court dismissed the action for lack of subject matter jurisdiction, finding that there was not a case or controversy between ECA and the DOE. There can be no dispute that a case or controversy exists between Plaintiff and ECA. Further, jurisdiction in the instant proceeding is premised upon diversity, as well as the federal questions raised by Plaintiff in its complaint.

ECA's outstanding secured and unsecured obligations and lack of liquidity prohibit Defendants from generally paying their obligations as they come due. The projected costs and net revenues associated with the Teach-Out Schools, as well as the claims of landlords resulting from the early termination of leases at the Teach-Out Schools, will exacerbate ECA's liquidity issues. Further, pending lawsuits threaten to strain ECA's ability to operate in the ordinary course and respond to claims of creditors. ECA needs to prevent a rush to judgment and attachment on its assets by landlords and other creditor, in order that the financially viable institutions ("Go-Forward Schools") may be sold to the party that submits the highest or otherwise best bid to acquire the Go-Forward Schools while ensuring that the students in the institutions that ECA plans to close ("Teach-Out Schools") have an opportunity to complete their programs. *Id. at* ¶ 17. Attached as **Exhibit 3** is a list of Go-Forward Schools. Attached as **Exhibit 4** is a list of Teach-Out Schools.

On or about September 10, 2018, ECA announced that it intended, in accordance with the expectations of the HEA, to discontinue new enrollments and to teach out the students already enrolled at twenty-six of its campuses, after which it intended to close those twenty-six campuses. These schools remain vital assets of ECA, as the regulations governing teach-out require that the students be able to complete their degrees at the campus at which they are enrolled, unless sooner transferred. While ECA seeks opportunities to transfer the students to alternate campuses or otherwise sooner fulfill its HEA requirements, or otherwise mitigate the costs associated with the teach-out, there can be no assurance at this time that ECA will be able to transfer the students at Teach-Out Schools to other campuses, whether owned and operated by ECA or another institution. Accordingly, ECA plans to remain in possession of all or most Teach-Out School campuses at least through June 2019, certain campus teach-out programs are anticipated to continue through the end of 2019, and maintain its educational programs and services at those Teach-Out School

campuses through that date for the benefit of students, who are still enrolled at that time, subject to the receivership estate's administration of the Teach-Out Schools. *Id. at* ¶ 14.

ECA further intends to continue to operate each of the Go-Forward Schools, subject to the receivership estate's administration of the Go-Forward Schools. *Id. at* ¶ 15.

### ii.     ECA's Capital Structure

On October 15th, Plaintiffs entered into that certain 8th Amendment to the Credit Agreement (as amended time to time, the "Monroe Credit Agreement"), with Monroe Capital Management Advisors, LLC ("Monroe"), as administrative agent and collateral agent, and each of the lender parties thereto (the "Monroe Lenders"). *Id. at* ¶ 12.

Under the Monroe Credit Agreement, the Monroe Lenders agreed to lend $16 million to ECA (as amended from time to time, the "Monroe Term Loan"). As of the commencement of these proceedings the outstanding principal balance owing to the Monroe Lenders is $19 million. *Id.*

All obligations under the Monroe Credit Agreement are secured by a first priority security interest in all of ECA's assets, including all equity interests in the respective subsidiaries. *Id.*

In connection with entering into the 8th Amendment, ECA and the Monroe Lenders provided a mechanism for a $12 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court and a second $7 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court. Without having received funding on October 15, 2018, ECA would have been materially challenged to meet its payroll obligations during the week of October 15th. ECA anticipates that it will require additional capital of $12 million by the first week in November 2018 and additional capital of $7 million by the first week in December 2018. Thereafter, beginning in January 2019, ECA projects that it will operate on a cash-flow-positive basis. *Id.*

### iii. Efforts to Fund Operations, Stabilize, and Facilitate a Sale

ECA has limited options available to it, but to seek the restructuring of its operations and debts through a federal receivership, which is the only way in which it can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfil their regulatory requirements to teach out the students, while also permitting ECA's directors and officers to maximize the value of the ECA enterprise for the benefit of ECA's stakeholders. *Id. at* ¶ 22. Most significantly, additional capital will only be made available to ECA through the receivership where ECA's funding sources may be assured that such additional advances will be used to complete the teach-out and bridge to a going concern sale of the Go-Forward Schools.

Without the protections provided by a receiver and the requested stay and injunction, ECA will not be able to access such additional funding and ECA's institutions will not be able to complete the teach-out of the Teach-Out Schools or reorganize or sell the Go-Forward Schools. *Id. at* ¶ 23. Seeking protection in a traditional bankruptcy filing is not an option for ECA because the HEA specifically defines an "eligible institution" as one that, *inter alia*, has not filed for bankruptcy. 20 U.S.C. § 1002 (a)(4)(A).

### iv. Restructuring Plan in Principle

ECA has determined that to operate successfully, it needs to close the 26 Teach-Out Schools and restructure its capital structure or sell the remaining business in order to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure and otherwise from its excessive overhead. ECA has worked diligently to shrink its overhead, but these savings alone are insufficient to turn the corner on ECA's ability to operate profitably. *Id. at* ¶ 24.

Under the proposed restructuring plan (the "Restructuring Plan"), the Monroe Lenders, or certain of them (in their capacity as a bidder for the assets of ECA, the "Stalking Horse") has offered

to purchase the Go-Forward Schools and ECA's management platform by credit bidding ECA's Receivership Financing Obligations, plus assume certain liabilities and certain beneficial contracts and leases, plus use the purchased management platform to continue to administer the Teach-Out Schools and pay the Teach-Out Schools' negative operating cash flow ("Stalking Horse Bid"), pursuant to which ECA would transfer the Go-Forward Schools and management platform assets free and clear of all claims, liens and encumbrances.  The receivership estate would retain the Teach-Out Schools, which upon completion of the teach-out process would undergo an orderly windup in compliance with all state and federal laws and regulations and all accreditation requirements.  *Id. at* ¶ 25.

Defendant requests that the federal receivership estate comprise all assets, property rights and defenses of ECA, much like a bankruptcy estate under 11 U.S.C. § 541.  Defendant requests that the Court appoint Sean M. Harding of FTI Consulting as receiver ("Receiver") and that the Receiver be given broad authority over the receivership estate, similar to the role of a chief restructuring officer, leaving in place ECA's boards of directors and management and other employees to continue to operate ECA's business and operate the institutions in the ordinary course, subject to the boards' and Receiver's direction, and to grant to the Receiver the power to direct restructuring transactions such as the Receivership Financing and the sale of ECA's assets.

This Court has national jurisdiction over all assets, by whomsoever held, wherever located within the United States, and the ability to channel all claims that have accrued as of the commencement of these proceedings and thereafter, including without limitation, those against the Teach-Out Schools and ECA directly, or as guarantor, into the receivership estate for ratable distribution of the remaining assets.

C. **Regulatory Challenges**

ECA institutions and students are eligible for federal student aid programs under Title IV of the HEA.[2] ECA's institutions operate in a highly regulated environment. They are subject to oversight by various federal and state regulatory authorities including, most prominently, the Department of Education ("DOE"), as well as their accrediting agencies. *Ranchino Declr. at* ¶ 7.

The regulatory bodies that govern the Plaintiffs' operations, including but not limited to the DOE and the following State Authorities and Accrediting Agencies, are aware of this receivership filing: Alabama Community College System; Arizona State Board of Private Postsecondary Education; California Bureau of Private Postsecondary Education; Colorado Division of Private Occupational Schools; Florida Commission for Independent Education; Georgia Nonpublic Postsecondary Education Commission; Indiana Board for Proprietary Education; Louisiana Board of Regents; Maryland Higher Education Commission; Massachusetts Department of Higher Education; Mississippi Commission for Postsecondary School and College Registration; Nevada Commission on Postsecondary Education; North Carolina Community College System; University of North Carolina Board of Governors; Ohio State Board of Career Colleges and Schools; Ohio Department of Higher Education; Pennsylvania Board of Private Licensed Schools; South Carolina Commission on Higher Education; Tennessee Higher Education Commission; Texas Workforce Commission; Texas Higher Education Coordinating Board; State Council of Higher Education for Virginia; Accrediting Council for Independent Colleges and Schools ("ACICS"); and New England Commission on Higher Education, Inc. *Id. at* ¶ 8.

Following its review of ECA's fiscal year 2016 audited financial statements, the DOE in a letter dated October 18, 2017, calculated ECA's financial responsibility composite score

---

[2] For the avoidance of doubt, ECA subsidiaries Culinard, LLC, and J.Y. Monk Real Estate Training Center, Inc. are not so eligible.

("Composite Score") as 1.2 and determined that ECA therefore failed to meet the financial responsibility standards outlined in 34 C.F.R. § 668.172. As a result, ECA chose to continue to participate in the Title IV programs under the Zone Alternative described in 34 C.F.R. § 668.175. Under the Zone Alternative, DOE placed ECA in provisional certification status and required ECA to make (a) Title IV program disbursements under the Heightened Cash Monitoring payment method; (b) mandatory notifications to the DOE should any one of a number of potential events occur; and (c) additional quarterly reports to the DOE about various financial and operational matters. *Id. at* ¶ 18. The DOE notified ECA in a subsequent letter dated February 29, 2018, of additional financial and operational reporting requirements arising from its review of the fiscal year 2016 audited financial statements. *Id. at* ¶ 19.

ECA submitted its fiscal year 2017 audited financial statements to the DOE on or about June 28, 2018. ECA simultaneously submitted to the DOE a Statement of Support explaining that certain extraordinary items and changes in accounting estimates should be considered when calculating ECA's 2017 Composite Score. The DOE in August asked ECA to file voluminous operational and financing records to aid in its review of the fiscal year 2017 audited financial statements. If DOE rejects the arguments outlined in the Statement of Support, then DOE will calculate the 2017 Composite Score as less than 1.0. *Id. at* ¶ 20.

If ECA's 2017 Composite Score as determined by DOE is under 1.0, then ECA and its students will not be able to continue to participate in the Title IV programs unless ECA posts an irrevocable letter of credit with the DOE representing a percentage of ECA's fiscal year 2017 Title IV disbursements, which ECA would be unable to provide. *Id. at* ¶ 21.

**D.** **Irreparable Harm Will Occur to ECA and Its Students Unless a Receiver is Immediately Appointed and a Temporary Restraining Order and Preliminary Injunction Against Other Claims is Entered**

The immediate appointment of the Receiver and the entry of an injunction staying and barring other claims is necessary to prevent Plaintiffs and their students from suffering immediate and irreparable harm. The Receiver is necessary to the orderly oversight and administration of the teach-out and delivery of educational programs to students enrolled at the Teach-Out Schools and, after closure of those campuses, the orderly disposition of their assets under the supervision of this Court. The entry of a Temporary Restraining Order and Preliminary Injunction, including an injunction against eviction proceedings, is necessary to prevent a race to ECA's assets and the resulting disruption of the teach-out process to the detriment of thousands of students. *Ranchino Declr. at ¶ 26.*

## II.    ARGUMENT

**A.    The Court Should Appoint a Receiver**

When assessing whether a federal equity receivership is appropriate in an adversarial context, federal courts consider the following factors: "(1) the probability that fraudulent conduct has occurred or will occur; (2) the validity of the claim by the party seeking the appointment; (3) whether there is an imminent danger that property will be concealed, lost, or diminished in value; (4) the inadequacy of [alternative] legal remedies; (5) the lack of a less drastic equitable remedy; and (6) the likelihood that appointing the receiver will do more good than harm." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993) (discussing the factors relevant to the receivership inquiry); *see also* 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure Civil* § 2983 (2d ed. 1997).

In regard to the first factor, Plaintiff herein has alleged that ECA has "defrauded the federal government by representing that tuition, including without limitation, the Tuition Loans, would be

used to pay for [Defendants'] operating expenses, including the amounts due [Plaintiff under] the Leases." *See Complaint at* ¶ 7. Plaintiffs also seek an equitable remedy – a constructive trust – to avert potential damages related to the alleged fraud. While Defendants deny strenuously that any fraud has occurred, it agrees with Plaintiff that an equitable remedy – the appointment of a Receiver – is appropriate in this case. In any event, courts have held that where dire financial circumstances justify the appointment of a Receiver, demonstrating fraud becomes a "non-factor." *See D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008) (Courts "[have] appointed receivers even where there was no evidence of fraud."); *see, e.g., U.S. Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 251-54 (S.D.N.Y. 2012) (appointing a receiver in the absence of fraud where target faced imminent risk of a loss of enterprise value). ECA's dire financial circumstances are well documented herein.

Second, ECA has valid defenses and a strong claim for equitable relief that will benefit both parties herein, as well as ECA's other creditors and stakeholders. As set forth in Defendants' Answer to the Complaint, pursuant to O.C.G.A. § 44–7–51(b) a tenant's answer to a dispossessory proceeding "may contain any legal or equitable defense or counterclaim." A tenant can raise an equitable defense when dispossessing the tenant will be a hardship. *See Davita, Inc. v. Othman*, 270 Ga. App. 93, 96, 606 S.E.2d 112, 115 (2004). Equity jurisdiction exists to protect and provide relief to parties when remedies available at law would be deficient or unjust. O.C.G.A. § 23-1-3. Although it does not operate when there is an adequate legal remedy, if the legal remedy is inadequate or incomplete, equity retains jurisdiction. O.C.G.A. § 23-1-4. Where equity jurisdiction is properly invoked, the Court must exercise this jurisdiction to provide complete relief.

Equity seeks always to do complete justice. Hence, having the parties before the Court rightfully, it will proceed to give full relief to all parties in reference to the subject matter of the

action, provided the court has jurisdiction for that purpose. O.C.G.A. § 23-1-7. The law commands the Court to achieve full relief by "considering that done what ought to be done and direct[ing] its relief accordingly." O.C.G.A. § 23-1. A court can grant equitable relief to delay a dispossessory action when there are special circumstances:

> It is fundamental, of course, absent special circumstances, such as, insolvency of the landlord, or inadequacy of any legal defense which could be interposed thereto, that equity will not interfere with a dispossessory proceeding to enjoin the same, since whatever defenses the tenant may have to such proceeding may be interposed in the dispossessory proceeding as readily as in a court of equity.

*Lee v. Peck*, 228 Ga. 448, 450 (1971); O.C.G.A. § 23-1-4

Special circumstances may exist where immediate dispossession is a hardship on the tenant and third parties. *See Davita*, 270 Ga. App. at 96. There is a hardship on the tenants when moving would harm third parties and this harm is not a result of the tenant's failure to act. *See id*. (finding no hardship after a dialysis facility failed to renegotiate an expired lease for nearly six months); *see also Navajo Academy v. Navajo United Methodist Mission School*, 109 N.M. 324, 785 P.2d 235 (1990) (extending a lease for three years to allow the school to find an alternative campus without causing irreparable harm to current and future students).

Although the instant action is not a dispossessory action, Plaintiff has filed a related dispossession action against Defendants that is pending before this Court. *See VC Macon, GA, LLC v. Virginia College, LLC*, Case No. 5:18-cv-00385-TES (M.D. Ga.).

There are unique circumstances here that would not be present in a typical dispossessory action. Virginia College's campus in Macon, Georgia is a school where countless students are currently enrolled and taking classes. If Virginia College is evicted, the hardship would fall on the students, who could no longer focus on their education, but instead will suddenly be stranded and unsure of the status of their education and degrees. The potential harm to the student body is not a

result of Defendants' failure to act. Defendants have been diligently attempting to fulfill its obligations to both Plaintiff and its students.

Accordingly, Defendants submit that they have demonstrated a likelihood of success on their claims for equitable relief in the form of a receivership to take control of all of Defendants' property in order to allow Defendants to remain in possession of the premises and their students to remain enrolled at the Virginia College campus in Macon, Georgia until the students can complete their educations and graduate.

Third, ECA has established that there is an imminent threat that its property will be severely diminished in value. Without the appointment of a receiver, ECA will be forced to close in the near to immediate future, resulting in students' education being disrupted and the loss of Title IV funds and its other assets. If the receiver is not appointed, there will be no teach out and no recovery for creditors. Thus, ECA faces imminent danger that its property will be diminished in value.

The last three factors - the inadequacy of [alternative] legal remedies; the lack of a less drastic equitable remedy; and the likelihood that appointing the receiver will do more good than harm – all circle around the concept of balancing the equities among the persons who will be burdened by and benefit from the receivership. With respect to the first of these factors, there are, in fact, no other adequate legal remedies for the following reasons:

- Seeking protection in a traditional bankruptcy filing is simply not an option for ECA because a bankruptcy filing would immediately and permanently render ECA institutions ineligible to participate in the federal student aid programs authorized by the HEA, and ECA's students would lose access to the federal grants and loans necessary to pay their tuition and fees (discharge of a portion of the student loan obligations falls far short of leaving the students unimpaired as the students will face the immediate disruption of their educational goals, challenges of transferring credits and delays in obtaining their sought after accredited degrees);

- ECA performs many management functions for its institutions, including, without limitation, finance, accounting, cash management, bulk purchasing of services and supplies, marketing, human resources and many other services, on account of which

the institutions are charged a fees by ECA. Accordingly, multiple receiverships over each institution would be impracticable, if not impossible, to administer under the circumstances of ECA's business;

- A single federal receivership over this collective proceeding of competing interests among ECA's stakeholders is the only available relief that would allow Plaintiffs to address these actions in a coordinated, consolidated fashion through application of 28 U.S.C. § 754 and 28 U.S.C. §1692; and

- This is not a case of a plain vanilla breach of contract case; instead, it is a case where a receiver is necessary to preserve the property for the benefit of ECA's students and other stakeholders, see *U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Property LLC*, 866 F. Supp. 2d 247, 256 (S.D.N.Y. 2012) (appointing a receiver to effectuate the foreclosure and liquidation of the properties that are spread over six states).

Lastly, it is beyond dispute that appointing a receiver in this case will do more good than harm. As set forth herein, the appointment of the Receiver will permit ECA to, *inter alia*, satisfy its educational obligations to thousands of students at the Teach-Out Schools, preserve the educational futures of students at the Go-Forward Schools, maximize enterprise value of the Go-Forward Schools, prevent millions of dollars of loss to the Treasury in the form of discharge obligations (which would be borne by taxpayers), provide significant adequate assurance to numerous landlords, and allow for an orderly transition of Plaintiffs' operations through the Restructuring Plan. On the other hand, if the requested receivership relief is not granted, students at both Teach-Out and Go-Forward Schools will see their educational plans disrupted, if not altogether eliminated, the enterprise value of ECA's Go-Forward Schools will be lost, the Treasury (as supported by taxpayers) will be burdened with millions of dollars of discharge obligations, and landlords will receive no further payments.

It is important to stress that, in circumstances similar to those of ECA, receivers have been appointed in state court so that educational institutions could continue to disburse Title IV to enable students to continue their educational programs.[3]

## B.    The Court Should Enter An Emergency TRO and Preliminary Injunctive Relief

The standard for granting either a temporary restraining order ("TRO") or preliminary injunctive relief is the same. A TRO and preliminary injunctive relief are warranted, pursuant to Federal Rule of Civil Procedure 65, if Defendants demonstrate that: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury if the injunction is not granted; (3) an injunction will not substantially injure other interested parties; and (4) an injunction will further the public interest. *See Winter v. Nat'l Res. Defense Council*, 555 U.S. 7, 20 (2008) (identifying factors for preliminary injunctive relief); *see also, Jysk Bed'N Linen*, 810 F.3d 767, 774 (11th Cir. 2015) (listing preliminary injunction factors); *see also, Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (identifying preliminary injunction factors).

The requested relief is warranted here because (a) there is a strong likelihood that the equitable defenses raised by Defendants herein will succeed on the merits (as discussed above); (b) the Defendant and its affiliated institutions, as well as their students, will suffer immediate and irreparable harm unless the Receiver is immediately appointed to oversee and administer the closure and teach-out of the Teach-Out Schools and the orderly disposition of their assets under the supervision of this Court; (c) it is necessary to prevent a race to ECA's assets, to enjoin eviction proceedings, and to prevent a disruption of the teach-out process as required by the HEA; (d) the

---

[3] In one such instance, in the midst of high-stakes litigation that would render it inoperable, Vatterott Education, Inc. sought the appointment of a receiver to continue operating its schools and facilitate a sale of its assets as a going concern. The Receiver was appointed and the educational institutions have continued to provide Title IV for the benefit of Vatterott's students. *See In re Vatterott Educ. Ctrs., Inc.*, No. 17SL-CC02316 (St. Louis Mo. Cir. Ct. 2017).

Plaintiff will experience less harm than ECA in absence of the appointment of a receiver; and (e) the public interest weighs heavily in favor of appointing a Receiver to permit Defendant and its affiliates to continue their educational mission for the benefit of their students and to facilitate an equitable distribution of ECA's assets for the benefit of ECA's creditors.

The Defendant has no alternative legal remedy as seeking protection in a traditional bankruptcy filing is simply not an option for ECA because a bankruptcy filing would immediately and permanently render ECA institutions ineligible to participate in federal student aid programs authorized by the HEA. If ECA filed for bankruptcy, ECA's students would lose access to the federal grants and loans necessary to pay their tuition and fees and face the immediate disruption of their educational goals, challenges of transferring credits, delays in obtaining their sought after accredited degrees, and inability to access Title IV funds to cover immediate living expenses, such as rent, groceries, daycare expenses, etc. A single federal receivership over this collective proceeding of competing interests among ECA's stakeholders is the only available relief that would allow ECA to address these actions in a coordinated, consolidated fashion through application of 28 U.S.C. § 754 and 28 U.S.C. § 1692 .

As noted above, without the immediate appointment of the Receiver, the Debtors face imminent, irreparable harm due to their current financial vulnerability. This present action is one of many landlord actions seeking to dispossess ECA from possession of its campuses and to recover on alleged claims for monetary judgments, which are ongoing. In addition, ECA is subject to other pending and threatened commercial and employment litigation and arbitration proceedings. The immediate appointment of the Receiver will ensure that ECA is able to operate to closure the Teach-Out Schools, restructure their capital structure, and attend to their debts in an orderly fashion (and not have their resources, both personnel and financial, distracted from

completing the teach-outs and preserving the value of the Go-Forward Schools) so that the ECA can maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure.

The Plaintiff and other similarly situated landlords and creditors will suffer less harm than the Defendant and its affiliates if the Receiver is immediately appointed and the TRO and Preliminary Injunction are entered. The appointment of the receiver will enable ECA to, *inter alia*, satisfy its educational obligations to thousands of students at the Teach-Out Schools, preserve the educational futures of students at the Go-Forward Schools, stabilize the employment of ECA's 3,200 employees, prevent many tens of millions of dollars of loss to the Treasury in the form of student loan discharge obligations (which would be borne by taxpayers), provide significant adequate assurance to numerous landlords, and allow for an orderly transition of Plaintiffs' operations through the Restructuring Plan. On the other hand, if the requested receivership relief is not granted, students at both Teach-Out and Go-Forward Schools will see their educational plans disrupted, if not altogether eliminated, all of ECA's 3,200 employees will be terminated, the Treasury (as supported by taxpayers) will be burdened with millions of dollars of discharge obligations, and landlords will receive no further payments.

Public policy greatly favors protecting the ECA and its students. ECA's student population largely comprises nontraditional students such as unemployed or underemployed adults, seeking to obtain job skills in order to find employment or to change careers. The immediate appointment of the Receiver and the entry of an Order restraining and enjoining other claims will ensure that ECA is able to fulfill the mission of educating students without the unnecessary disruption of the students' educational plans.

Defendant requests that from the time and date of the Proposed Receivership Order, a stay of other actions asserting claims against ECA is in effect, enjoining:

A.  The commencement or continuation, including the issuance, employment, or service of process, of a judicial, administrative, or other action or proceeding against ECA that was or could have been commenced before the entry of the order of appointment, or to recover a claim against the debtor that arose before the entry of the order of appointment;

B.  The enforcement against ECA or any estate property of a judgment obtained before the order of appointment;

C.  Any act to obtain possession of estate property from the receiver, or to interfere with, or exercise control, over, estate property;

D.  Any act to create, perfect, or enforce any lien or claim against estate property except by exercise of a right of setoff, to the extent that the lien secures a claim against the debtor that arose before the entry of the order of appointment; or

E.  Any act to collect, assess, or recover a claim against the debtor that arose before the entry of the order of appointment; provided, however, that Defendant and ECA do not seek to enjoin or otherwise interfere with the DOE's or any accrediting agency's supervision of ECA and enforcement of applicable rules and regulations.

WHEREFORE, Defendant respectfully requests that the Court:

A.  Immediately enter an Emergency Temporary Restraining Order and Preliminary Injunction;

B.  Immediately enter an order appointing a federal receiver; and

C.       Grant such other and further relief as the Court deems just and equitable.

DATE: November 6, 2018

Respectfully submitted

*/s/ Alexander B. Feinberg*
Alexander B. Feinberg (Georgia Bar No. 956505)
**Maynard Cooper & Gale**
1901 Sixth Avenue North
Suite 2400, Regions/Harbert Plaza
Birmingham, Alabama 35203-2618
T: (205) 254-1000
F: (205) 254-1999
E: afeinberg@maynardcooper.com

*/s/ Walker S. Stewart*
Walker S. Stewart (Georgia Bar No. 221715)
**Hall, Bloch, Garland & Meyer, LLP**
577 Mulberry St.
Suite 1500
Macon, Georgia 31201
T: (478) 745-1625
F: (478) 741-8822
E: walkerstewart@hbgm.com

*Attorneys for Defendants Virginia College, LLC and Education Corporation of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of November, 2018, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which served notice

of this electronic filing upon the following:

> Jon A. Gottlieb
> Flynn & Gottlieb, P.A.
> 800 Johnson Ferry Road
> Atlanta, GA
> jong@lawfg.com
>
> *Attorney for Plaintiff*

*/s/ Walker S. Stewart*_____
OF COUNSEL
