# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| **VC MACON GA, LLC** | |
| **Plaintiff,** | |
| v. | |
| **VIRGINIA COLLEGE, LLC and EDUCATION CORPORATION OF AMERICA** | Civil Action No. 18-cv-00388-TES |
| **Defendants.** | |

### SUPPLEMENTAL DECLARATION OF MICHAEL RANCHINO IN SUPPORT OF EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER AND ENTRY OF A PRELIMINARY INJUNCTION

I, Michael Ranchino, hereby declare and affirm the following, under penalty of perjury:

1. I am over twenty-one (21) years of age and otherwise competent to testify as to the matters set forth herein. I have personal knowledge of the matters set forth herein.

2. I am an Executive Vice President and the Chief Financial Officer of Education Corporation of America and Virginia College, LLC. My office address is 10 S. Wacker Drive, Chicago, IL 60606.

3. I am submitting this Affidavit in support of the *Emergency Motion for the Appointment of a Receiver and for a Temporary Restraining Order and Preliminary Injunction* filed by Defendant Virginia College LLC and its affiliates Education Corporation of America, Inc. and New England College of Business and Finance, LLC ("NECB" and

together with Education Corporation of America and Virginia College LLC, "ECA" or the "company").

4.   I earned my B.S. in Accounting from Illinois State University in 1993. I have over twenty-five years of experience in the supply chain, strategy, accounting and finance functions in the food distribution and retail industries. Before joining ECA in June of 2018, I worked with US Foods for over 11 years in various financial positions, culminating in the role of Senior Vice President for Supply Chain Operations. I have held my current position at ECA for the last four months.

5.   At ECA, I am responsible for managing the financial affairs of ECA and its subsidiaries, including managing the company's cash flow, supervising the preparation of the company's operating projections, analyzing the company's financial strengths and weaknesses and proposing corrective actions and managing the finance and accounting personnel and activities to ensure that the company's financial reports are accurate and completed in a timely manner. In my capacity as CFO of ECA, I have become familiar with the company's capital structure, its secured obligations, unsecured obligations and the several layers of preferred and common equity. Further, I have become familiar with the books, records and financial affairs of NECB, as NECB's financial affairs comprise a part of ECA's consolidated financial affairs.

6.   ECA is a holding company that owns 100% of the limited liability company membership interests in Defendant Virginia College, LLC and NECB. ECA also indirectly owns 100% of the equity interests in Culinard, LLC and J.Y. Monk Real Estate Training Center, Inc., neither of which is party to a program participation agreement ("PPA") with the U.S. Department of Education ("DOE") and neither of which receives federal student aid funding under Title IV of the HEA.

7. ECA operates at 74 campus locations in twenty (20) states, as well as on-line programs.

8. All told, ECA currently has approximately 20,000 students enrolled in all of its programs.

9. ECA employs approximately 3,200 people, including those employees that participate in the delivery of academic programs and in ECA's back office delivering shared managed services to each of the campuses.

10. ECA has four campuses located in Georgia with approximately 1,163 students pursuing academic programs, with approximately 828 students attending Go-Forward Schools (as defined below) and 335 students attending Teach-Out Schools (as defined below).

11. ECA has approximately 251 employees in Georgia directly supporting the students enrolled at the Georgia campuses.

12. ECA's revenues for the 9 months ending September 30, 2018 totaled approximately $313 million.

13. Attached to the Defendant's Motion are Exhibits 3 and 4, representing schedules of the campuses and their locations.  **Exhibit 3** is a list of the "Go-Forward Schools", which are those schools that can be stabilized and sold for long-term operations, and **Exhibit 4** is a list of the "Teach-Out Schools", which are those 26 schools that are in the process of teach-out leading to closure.

14. ECA provides a management platform to the institutions, including human resources, accounting, finance, cash management and treasury, marketing, student aid, academics, information technologies, purchasing, facilities management and other services that support the students, campuses and the operation of the business.

15. ECA institutions and students are eligible for federal student aid programs under Title IV of the Higher Education Act of 1965 ("Title IV programs" and the "HEA") by virtue of ECA's institutions being parties to PPAs.

16. ECA's institutions operate in a highly regulated environment. They are subject to oversight by various federal and state regulatory authorities including, most prominently, the DOE, as well as their accrediting agencies.

17. Of the approximate 20,000 students, approximately 85% pay their tuition through some form of Title IV federal student aid funding.

18. To my knowledge, the regulatory bodies that govern the ECA's operations, including but not limited to the DOE and the following State Authorities and Accrediting Agencies, are aware of this receivership filing: Alabama Community College System; Arizona State Board of Private Postsecondary Education; California Bureau of Private Postsecondary Education; Colorado Division of Private Occupational Schools; Florida Commission for Independent Education; Georgia Nonpublic Postsecondary Education Commission; Indiana Board for Proprietary Education; Louisiana Board of Regents; Maryland Higher Education Commission; Massachusetts Department of Higher Education; Mississippi Commission for Postsecondary School and College Registration; Nevada Commission on Postsecondary Education; North Carolina Community College System; University of North Carolina Board of Governors; Ohio State Board of Career Colleges and Schools; Ohio Department of Higher Education; Pennsylvania Board of Private Licensed Schools; South Carolina Commission on Higher Education; Tennessee Higher Education Commission; Texas Workforce Commission; Texas Higher Education Coordinating Board; State Council of Higher Education for Virginia; Accrediting Council for Independent Colleges and Schools ("ACICS"); and New England Commission on Higher Education, Inc.

19. The DOE regulates ECA's institutional participation in the federal student financial aid programs authorized under Title IV of HEA. ECA's institutions' participation in the Title IV programs enables their students to obtain federal student aid grants and loans. As is the case throughout contemporary higher education, many of ECA's students would not be able to pursue postsecondary education without access to these funds.

20. ECA's revenues flow almost exclusively from tuition and fees paid by its students, a significant majority of whom utilize federal grants and student loans provided under the HEA. Enrollment in many of ECA's campuses has been falling for several years. The decline in enrollment can be attributed to numerous regulatory and macroeconomic factors, including: the previous Administration's decision to remove the federal recognition of the ACICS, the agency that accredits nearly all of ECA's institutions, which required ECA to advise potential students of potentially dire consequences if ECA was unable to obtain alternate accreditation within a specified time frame, thereby causing some potential students to choose not to enroll or remain enrolled; and the recent upturn in the business cycle that has lowered the unemployment rate to historic levels, so that more of the nontraditional students typically enrolled in ECA's institutions are able to find employment without the need for more education or training.

21. Because ECA's revenues are produced almost entirely by tuition and fees paid by students, the enrollment decline has negatively impacted ECA's financial condition and cash flow. For months, ECA has not been able to timely service all of its financial obligations or timely meet its payables. Prior to the commencement of this proceeding, ECA was generally not paying its debts as they come due. ECA has been focused on marshaling its dwindling financial resources to maintain its campuses and its educational programs and services for its students.

22.     ECA's current financial obligations are as follows:

A.      On October 15, 2018, ECA entered into that certain Eighth Amendment to the Credit Agreement (as amended time to time, the "Monroe Credit Agreement"), with Monroe Capital Management Advisors, LLC ("Monroe"), as administrative agent and collateral agent, and each of the lender parties thereto (the "Monroe Lenders").

B.      Under the Monroe Credit Agreement, on October 15, 2018 the Monroe Lenders advanced $16 million to ECA (as amended from time to time, the "Monroe Term Loan"). As of the commencement of these proceedings the outstanding principal balance owing to the Monroe Lenders is $19 million.

C.      All obligations under the Monroe Credit Agreement are secured by a first priority security interest in all of ECA's assets, including all equity interests in ECA's subsidiaries.

D.      In connection with entering into the Eighth Amendment, ECA and the Monroe Lenders provided a mechanism for a $12 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court and, if needed, a second $7 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court. The additional funding would provide the basis for ECA to continue to fund the costs of the Teach Out Schools to maintain educational services for all of those students, as well as stabilizing the Go Forward Schools to maintain their educational services.

E.      Without having received funding on October 15, 2018, ECA would have been materially challenged to meet its payroll obligations during the week of October 15. ECA anticipates that it will require additional capital of $12 million by the middle of November 2018 and if needed, additional capital of $7 million in the middle of December

2018. Thereafter, beginning in January 2019, ECA projects that it will operate on a cash-flow-positive basis.

  F. As of October 5, 2018, ECA had unsecured debt owing to 1,033 vendors and landlords amounting to approximately $46,773,000.

  G. On October 26, 2018, I received a written commitment from certain of the Monroe Lenders to advance the $12 million tranche referred to above. This commitment letter reaffirms that the funding is available only upon the entry of an order by this Court at the request of a receiver.

23. In the ordinary course of its business, ECA's institutions lease real estate to operate at their various campuses and administrative offices. A list of ECA's institutions' leased real estate and other locations is contained in **Exhibit 2** to its Motion.

24. Several ECA campuses are presently the subject of landlord actions to recover on alleged claims for monetary judgments, which are ongoing, as well as to dispossess ECA from possession of such campuses. ECA has also received multiple notices of default, generally a precursor to a lawsuit, across its campuses.

25. The landlords have been very aggressive. As of October 31, 2018, the company received in excess of 50 default notices from landlords, 14 notices from landlords threatening to exercise self-help and 12 pending lawsuits brought by landlords.

26. I understand that state regulatory approvals, accreditation approvals, and Title IV eligibility are attached to specific physical locations. If the company is evicted from one location, it cannot relocate to another location until that new location has received state regulatory and accrediting agency approvals. Students enrolled at the new location cannot receive Title IV funding until the new location has been approved as an eligible location by the DOE, which DOE would consider only after the new location has obtained the required regulatory approvals. I understand that such approvals

require at least several months to obtain and that the education of the students enrolled at the evicted campus would be disrupted, potentially for an extended period of time or permanently.

27.     As I understand the applicable laws and regulations, ECA has an obligation to complete the educational program and deliver accredited degrees or diplomas to the students it has enrolled at its campuses, even if ECA has determined to close a campus.

28.     On or about September 5, 2018, ECA gave notice to the Department and on September 10, 2018 announced that it intended to cease enrolling new students at 26 of its campuses, teach-out the students and close those campuses. ECA's teach-out plans identify target dates to complete the teach-out of the students and close the campuses. ECA believes that the target dates are outside dates and that there are several strategies that ECA may employ to shorten the teach-out program at many of its campuses, while complying with applicable laws, regulations and rules, and ECA intends to avail itself of such opportunities in order to reduce the costs of the teach-out programs. ECA's ability to continue to operate in compliance with applicable laws, regulations and rules is dependent on its and its students' continued participation in Title IV programs.

29.     ECA's outstanding secured and unsecured obligations and lack of liquidity prohibit ECA from generally paying their obligations as they come due. The projected costs and net revenues associated with the Teach-Out Schools, as well as the significant claims of landlords upon the termination of the Teach-Out School leases, will exacerbate ECA's liquidity issues. Further, pending lawsuits threaten to strain ECA's ability to respond to claims of creditors. ECA needs to prevent a rush to judgment and attachment on ECA's assets, in order that the Receiver may run a marketing process to sell the financially viable Go-Forward Schools while ensuring that the students in the Teach-Out Schools have an opportunity to complete their programs.

30.     ECA has operated through most of 2018 with negative cash flow. The company is taking steps to turn the corner, but part of that restructuring plan involves obtaining additional funding

and the sale of the Go-Forward Schools free and clear of the company's pre-receivership obligations. ECA believes that through a confluence of stabilization of enrollment and cost reductions, it can see a path forward to a time beginning in January 2019 when ECA is projected to operate on a positive cash flow basis.

31. I am familiar with the company's operating projections through 2019. The projections reflect a need for additional funding of approximately $35 million, of which ECA has already obtained loans totaling $16 million, and assume that an additional $12 million will be funded in mid-November and another $7 million in December should it be needed. The projections reflect that with those funds in hand and with the company executing on mitigation strategies both pertaining to the teach-out and other cost cutting measures, ECA will have sufficient funds to operate through January, after which ECA will operate on a cash positive basis. The company's 2019 projections reflect an operating profit of $11.5 million including the costs of the closure of the Teach-Out Schools.

32. As of October 31, 2018, the company was obligated to approximately 1,033 vendors, including landlords, totaling $47 million, including past due rent. Presently, on average, the company is 3 months past due in the payment of rents.

33. ECA is not aware of any option that would permit the Go-Forward Schools to continue to operate, other than to seek the restructuring of their operations and debts through a federal receivership. A federal receivership, as I understand the process, is the only way in which ECA can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfil their regulatory requirements to teach-out the students, while also permitting ECA's directors and officers to maximize the value of the ECA enterprise for the benefit of ECA's creditors and other stakeholders.

34. Without the protections provided by the creation of a single receivership estate and the appointment of a single receiver and the requested stay and injunction, ECA's institutions will not

be able to complete the teach-out of the Teach-Out Schools or reorganize the Go-Forward Schools. Our counsel has advised us that seeking protection through a traditional bankruptcy filing is not an option for ECA, because the HEA under 20 U.S.C. § 1002 (a)(4)(A) specifically defines an "eligible institution" as one that, inter alia, has not filed for "bankruptcy".

35. ECA has determined that to operate successfully, it is imperative that ECA remain eligible to participate in Title IV programs while it winds down the 26 Teach-Out Schools and restructures in order to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors that would arise if the Teach-Out Schools were forced into sudden closure and otherwise from its excessive overhead.

36. Under the proposed restructuring plan, the Monroe Lenders, or certain of them have orally offered to purchase the Go-Forward Schools and ECA's management platform by credit bidding their claims (exchanging their secured claims for equity in a new company that would purchase the assets of ECA free and clear of such secured claims), plus assuming certain liabilities and certain beneficial contracts and leases, plus using the purchased management platform to continue to administer the Teach-Out Schools and pay the Teach-Out Schools' negative operating cash flow, pursuant to which ECA would transfer the Go-Forward Schools and management platform assets free and clear of all claims, liens and encumbrances. I estimate the burden of enabling students to complete their programs at the Teach-Out Schools to be $5 million on whoever the buyer of the Go-Forward Schools may be, assuming that the sale transaction is consummated on or about June 30, 2019.

37. On October 9, 2018, on behalf of ECA I signed an agreement with Parchman, Vaughan & Co., L.L.C. ("Parchman Vaughan") to engage Parchman Vaughan as investment banker to run a sale process for the Go-Forward Schools. Parchman Vaughan has been performing its diligence and populating a data room with a view of soliciting initial interests by Thanksgiving.

38. The immediate appointment of a receiver and the entry of an injunction staying and barring other claims is necessary to prevent ECA and its approximately 20,000 students from suffering immediate and irreparable harm. A receiver is necessary to the orderly oversight and administration of the teach-out and delivery of educational programs to students enrolled at the Teach-Out Schools and, after closure of those campuses, the orderly disposition of their assets under the supervision of this Court. The entry of a Preliminary Injunction, including an injunction against eviction proceedings, as I understand it, is necessary to prevent a race to ECA's assets and the resulting disruption of the teach-out process to the detriment of thousands of students.

39. ECA faces imminent, irreparable harm due to their current financial vulnerability. As set forth above, several of the ECA's campuses are presently the subject of landlord actions to dispossess ECA from possession of such campuses and to recover on alleged claims for monetary judgments, which are ongoing.

40. The immediate appointment of a receiver and entry of an order restraining and enjoining these claims will ensure that ECA is able to operate to the orderly closure of the Teach-Out Schools and attend to their debts in an orderly fashion to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors that would arise if the Teach-Out Schools were forced into a sudden closure. The chart below presents a comparison of certain statistics of ECA and compares them to ECA's anticipated outcome in the event a receiver is appointed or if a receiver is not appointed and ECA is forced to commence bankruptcy. The avoidance of harm to ECA's 20,000 students through the appointment of a receiver is striking.

(Signature on Following Page)

I declare under penalty of perjury that the foregoing is true and correct.

Date: __11/6/18__                                          _____
                                                              Michael Ranchino

|  | As of 10/31/18 | Bankruptcy Chapter 7 | Receivership Restructuring Plan |
| --- | --- | --- | --- |
| Students | 20,000 | 0 | 15,000 |
| Landlords | 74 | 0 | 48 |
| Tuition Refund Obligations | $0 | Up to $221 million - $189 million to active students plus $32 million to inactive students | $0 |
| Landlord claims | Ave of 2 months' rent – total of $8.7 million | One year's rent limited by 11 USC 502(b)(6) of $55 million | 0 for Go-Forward Schools and $5.2 million for Teach-Out Schools |
| Time for LL to mitigate damages | 10+ months for LL of Teach-Out Schools | 0 | 10+ months for LL of Teach-Out Schools |
| Teach-Out Operating Deficit | Approximately $15 million | N/A | $5 million, Post closing assuming June 30, 2019 closing |
| Value of Active Student A/R | $35.7 million as of 9/30/18 | 0 | Approximately $24 million as of June 30, 2019 |