**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISON**

| | | |
|---|---|---|
| **VC MACON, GA LLC,** | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 5:18-cv-00388-TES |
| **VIRGINIA COLLEGE LLC,** | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

## RECEIVER'S INITIAL REPORT

COMES NOW, John F. Kennedy, Receiver in the above-styled action pursuant to the *Order Appointing Temporary Receiver and Granting Preliminary Injunction* (Doc. 26, "Appointment Order") filed on November 14, 2018, and hereby files his Initial Report pursuant the Appointment Order, respectfully showing the Court as follows:

### I. INTRODUCTION

On November 14, 2018, the Court entered the Appointment Order which appointed John F. Kennedy, Esq. as the receiver (the "Receiver")[1] for Education Corporation of America, Virginia College, LLC ("VC"), and New England College of Business and Finance, LLC ("NECB," together with Education Corporation of America and VC, "ECA"), with respect to all the business, business interests, and property of ECA (the "Receivership Property"). The Appointment Order authorized the Receiver to: take immediate possession of the Receivership Property and to have the full power to exercise the usual and customary powers afforded to a receiver; operate ECA's business with a primary focus on financing of the business and other restructuring or sale transactions, custody, and control of all assets of ECA; engage and

---

[1] Receiver may refer to Mr. Kennedy or a member of his Receivership team.

employee persons to assist him in fulfilling his duties; acquire and retain all rights to operate and maintain ECA; to assert any rights, claims, or causes of action on behalf of ECA; pay from ECA's assets any costs incurred from instituting or defending any action; have all the powers of the directors, officers, and managers of ECA; use, sell, or lease the Receivership Property; obtain credit and other financial accommodations for the benefit of the Receivership Property; enforce, disavow, reject, impair, or terminate any contract, agreement, or lease; and, take any further action as the Court deemed equitable. Doc. 26, pp. 4-7.

The Appointment Order also granted the Receiver immediate access to ECA's financials and business premises. The Appointment Order required the Receiver to report to this Court and the parties information regarding and describing the Receivership Property within sixty (60) days after the entry of the Appointment Order. Doc. 26, p. 7. The Receiver has prepared and filed this Initial Report within the first thirty (30) days of the Receiver's appointment due to the recent significant hardships facing ECA and the Receiver's decision to implement the necessary wind-down.

## II.    DISCUSSION

### 1. The November 14, 2018 Hearing

During the hearing on November 14, 2018 (the "Appointment Hearing"), certain representations were made before the Court. First, counsel for ECA informed the Court that ECA was seeking additional funding from ECA's investors. With the anticipated additional funding from the investors, along with the ordinary course of Title IV funds from the Department of Education ("DOE"), ECA would continue to operate, through the Receiver, by implementing the restructuring plan ("Restructuring Plan"). This Restructuring Plan contemplated allowing a predetermined twenty-six (26) campuses (the "Teach-Out Campuses") to achieve a teach-out

then close, while allowing forty-five (45) campuses (the "Go-Forward Campuses") to continue to operate in their ordinary course. During the Restructuring Plan, potential buyers were to be actively and intentionally pursued to purchase ECA. Once a potential buyer was approved and the funds from that sale were held by the Receiver in the Receivership Property, a claims process would be employed to allow all secured and unsecured creditors to make claims on the Receivership Property. The Receiver affirmed to the Court that he had been made aware of ECA's Restructuring Plan, with the ending goal being the sale of ECA (or its assets or substantially all of its assets), and the feasibility of the plan. Furthermore, as the Receiver stated during the Appointment Hearing, having an investor with the ability and willingness to infuse additional funds into ECA distinguished ECA and the appointment of a receiver in this case from any other receivership the Receiver had been appointed to.

During the execution of the Restructuring Plan, the Appointment Order enjoined all landlords from exercising certain rights against ECA and the Receivership Property. Specifically, landlords and "all other interested persons [were] enjoined from interfering with [. . .] property of the Receivership Estate [. . . .]" Appointment Order, Doc. 26, p. 9. The Court, however, ordered the Receiver during the Appointment Hearing to pay the landlords' monthly rent as long as the Receiver allowed ECA to remain in the landlords' properties. The Receiver affirmed to the Court that stub rent from the date of the Receiver's appointment would be paid for the month of November, and that moving forward, it was the intent that monthly rents would be paid to the extent the ECA remained in the landlords' properties.[2]

---

[2] In Plaintiff's Objection to the Receiver's Motion for Attorney's Fees (Doc. 54), Plaintiff contends that the Receiver misled the Court in stating that the Receiver would pay full rent for the month of November, yet only paid stub rent. The Receiver did not, and never intended to, mislead the Court regarding the partial payment of rent for the month of November. Rent was paid for the month of November for the time period covering the date of the Receiver's appointment, November 14, 2018, through the end of the month. The Appointment Order authorized the Receiver to pay expenses incurred after the appointment of the Receiver, and allowed the Receiver to pay obligations incurred

## 2. The Receiver's Initial Due Diligence

Following the Receiver's appointment, the Receiver commenced his due diligence regarding the financial status of ECA. A day after the Appointment Hearing, November 15, 2018, the Receiver, along with representatives from ECA, met with representatives from One Beacon. One Beacon is an issuer of surety bonds that had recently rescinded ECA's bonds due to ECA's financial condition. These bonds are required by some state licensing agencies as a condition of approval. The bonds are intended to protect students and states' interest in the event a school cannot fulfill its commitments to its students. Through the Receiver's negotiations, One Beacon agreed to reinstate a portion of ECA's bonds in return for partial collateral. One Beacon also agreed to meet with the Receiver on a monthly basis to further discuss and negotiate additional collateral for the reinstatement of additional surety bonds.

On November 20, 2018, the Receiver traveled to Birmingham, Alabama to visit with the ECA leadership team at the ECA headquarters. During the time in Birmingham, the Receiver met with department heads to attain a better understanding for the procedures and systems already in place, specifically the accounting, financial aid, and legal departments. The Receiver also had an introductory and substantive telephone conference with the president and chief executive officer of ECA, Mr. Stuart Reed.

Procedures and systems were established for the approval of disbursements. The Receiver met with ECA's chief financial officer, Mr. Mike Ranchino, and other ECA financial representatives to set forth the guidelines for which disbursements above a certain individual or aggregate amount, or those extraordinary to the normal course of business, were to be first approved by the Receiver. Those requested disbursements generally included categories such

---

*prior* to the appointment of the Receiver that were determined to be "prudent in order to preserve the value of [the] Receivership Property [. . . .]"

as: rent, accounts payables, payroll, stipends, regulated disbursements, and vendors. Attached as Exhibit A is the true and accurate summary of the requested disbursements that were approved by the Receiver.

The Receiver also implemented avenues of communication with the vendors and landlords. On or about November 20, 2018, a letter was sent to vendors to place the vendors on notice of the Appointment Order and the accompanying preliminary injunction. The letter also informed the vendors of the Receiver's intent to continue to operate ECA during the pendency of the receivership, and that in the future, a claims process would be implemented for the purpose of addressing any claims a vendor may have against ECA. Additionally, the Receiver attempted to communicate with the landlords that initially reached out to the Receiver regarding the implications of the Appointment Order to the landlords' respective properties.

The Receiver also worked directly with ECA leadership regarding the continued efforts to solicit a buyer for ECA, a major component of the Restructuring Plan. The Receiver joined weekly calls with Parchman, Vaughan, & Company, L.L.C. ("Parchman Vaughan"), the private investment banker hired to lead the sale of the Receivership Property. These weekly calls provided updates regarding the market for the sale of the Receivership Property, and provided the status of the preliminary conversations regarding any possible bids for the Receivership Property.

3.    Unintended Hardships

As noted above, there were two key aspects for the success of the Restructuring Plan: additional funding from the investor, and the continued ordinary course of the federal Title IV funding from DOE. Unfortunately, both aspects of funding were not received as anticipated to allow the Restructuring Plan an opportunity to succeed. Following a roller-coaster like series

of events, and despite the tremendous efforts of the Receiver and the Receiver's professionals, the Receiver was left with no decision but to implement the necessary wind-down and direct abrupt closing of the ECA campuses.

On November 8, 2018, the DOE placed ECA's institutions on Heightened Cash Monitoring 2 ("HCM2"). ECA and its institutions were previously on Heightened Cash Monitoring 1 ("HCM1"), which allowed ECA to draw its obligated Title IV funds on a weekly basis. On HCM2, however, ECA would only be allowed to request Title IV funds on a monthly basis, with DOE disbursing the funds only after its review and approval of numerous documents ECA would be required to submit to the DOE. While ECA was placed on HCM2 days before the appointment of the Receiver, the full ramifications of the restricted flow of federal funds was not fully known or appreciated until after the appointment of the Receiver.

The Receiver, along with ECA leadership, promptly began to appeal the DOE's implementation of HCM2. Mr. Roger Swartzwelder, general counsel for ECA, sent several notes and objections to the DOE, articulating reasons why HCM2 was not appropriate for ECA. These objections and requests for reconsideration were all denied, with little analysis and reasoning provided for the denials. Furthermore, the Receiver requested to have direct communication with DOE regarding its decision to place ECA on HCM2. In an email dated Wednesday, November 21, 2018, the Receiver specifically requested a meeting with the DOE representatives to discuss the implications of HCM2 on ECA and any possible avenues to have HCM2 rescinded or modified. The Receiver, at least initially, did not receive any communication from the DOE regarding their willingness to meet, or communicate at all, with the Receiver.

The DOE's actions of placing ECA's institutions on HCM2 had additional direct ramifications on the success of the Restructuring Plan. According to the investors, ECA's placement on HCM2 was a substantial change in conditions that, again according the investors, caused investors' offer for the additional funding to ECA to be reconsidered and rescinded. The Receiver negotiated and communicated with the investors, on a daily basis, to ensure that the investors appreciated the fact that without the additional funding, the Restructuring Plan would not be given an opportunity to succeed. Likewise, the Receiver was abundantly clear with the investors that without the originally promised additional funding being received in a timely manner, ECA would face a necessary wind-down. Through the continued discussions and negotiations with the investors, it became clear to the Receiver that additional funding would not be given while ECA remained on HCM2.

Based on this information, the Receiver and ECA leadership again turned their efforts to the DOE. As the DOE continued to refuse to communicate with the Receiver, the Receiver sought additional remedies to open channels of communication with the DOE. These channels included use of elected officials and current ECA board members directly advocating on ECA's behalf before the DOE. Through these efforts, a line of communication was established between the DOE and the Receiver.

The DOE granted the Receiver an opportunity to discuss ECA and HCM2 in person in Washington, D.C. On November 30, 2018, the Receiver and Mr. Ranchino traveled to Washington for a series of meetings with DOE representatives. During these meetings, the Receiver and Mr. Ranchino communicated ECA's financial status and the Receiver's intent to implement the Restructuring Plan. It was communicated that the success of the Restructuring Plan would provide ECA's thousands of students an opportunity to continue their education

while a structured teach-out process was implemented, instead of an abrupt closure of their campuses. The Receiver requested that ECA be removed from HCM2, or in the alternative, that there be a modified version of HCM2 implemented. With at least a minimum of a modified version of HCM2, this would allow the timely flow of federal funds to ECA, and to allow the Receiver to obtain the additional funding from the investor. Furthermore, the Receiver specifically informed the DOE that without the timely flow of federal funds from the DOE, and the additional funding from the investor, the Receiver would have no choice but to implement the necessary wind-down of ECA, without providing a full proper teach-out, at the beginning of the following week. The DOE made no representations regarding the Receiver's request, or when a decision would be made regarding the Receiver's request.

Within the next forty-eight hours of the Receiver's trip to Washington, the DOE requested certain financial documents and student records. The Receiver directed ECA to work with and to provide the DOE with any documents that was requested. To the best of the Receiver's knowledge, all requested documents have been provided to the DOE.

On Monday, December 3, 2018, it became increasingly clear to the Receiver that the DOE would not provide relief from HCM2, and that the investors would not provide the additional funding. Although there remained the *possibility* of additional funding to implement the Restructuring Plan, ECA professionals provided cash-flow projections that demonstrate that the decision to implement a necessary wind-down must be made the morning of Wednesday, December 5, 2018. In preparation for the likelihood that the necessary wind-down would commence, the Receiver and ECA leadership began to discuss the practical plans to implement the wind-down. The discussions included the communications to campus

presidents, employees, and students; providing instructions for students to receive transcripts; and the actual closure of the schools.

On Tuesday, December 4, 2018, less than twenty-four hours from the commencement of the wind-down process, several events added to the roller-coaster like series of events. First, a potential investor approached the Receiver with an offer to infuse a substantial amount of capital to ECA for implementation of the Restructuring Plan. This offer, however, was simply a preliminary offer, and the potential investor requested that the Receiver delay commencing the necessary wind-down by forty-eight hours in order for the potential investor to conduct due diligence. A significant aspect of the potential investor's due diligence included communicating with DOE and gaining DOE's approval, a task that the Receiver was fully aware would not be achieved quickly. As the cash forecast clearly did not allow for a forty-eight hour delay from commencement of the wind-down, the requested delay was not a viable and prudent option for the Receiver. In the Receiver's efforts, however, to attempt to gain the additional funding, the Receiver offered the potential investor the opportunity to purchase the requested forty-eight hours at a rate to cover ECA's expenses for delaying the wind-down. The Receiver reiterated to the potential investor that this was the only way to delay the wind-down from being commenced on the morning of Wednesday, December 5, 2018. The potential investor was not willing to purchase the additional time in response to the Receiver's terms.

Second, the original investor still remained unwilling to commit to the original offer for additional funding. Although being informed throughout the previous week that a decision regarding the necessary was looming, the investor requested additional time for the *possibility* to secure additional funding. The Receiver made this investor the same offer as was made to the new potential investor: that if the wind-down was going to be delayed for a period of time,

such an extension would have to be purchased. The investor would not commit to purchasing the extension, but requested until the morning of Wednesday, December 5, 2018, to make the ultimate decision regarding the extension.

The third major event that occurred on Tuesday, December 4, 2018, was the decision by the Accrediting Council for Independent Colleges and Schools ("ACICS"). ACICS is the accrediting body for all of ECA's institutions, other than NECB. ACICS had recently issued a show-cause order for ECA regarding the status of ECA's accreditation and had scheduled a hearing for Wednesday, December 5, 2018. Upon knowledge that ECA was seriously considering a wind-down due to ECA's financial status, ACICS withdrew ECA's accreditation effective December 19, 2018, which date ACISC later extended to December 21, 2018. The hearing was still held on Wednesday, December 5, but ACICS's decision to withdraw the accreditation stood.

Upon hearing of ACICS's decision to revoke ECA's accreditation, the original investor informed the Receiver, in writing, that he was no longer considering purchasing an extension to delay the wind-down. Additionally, the investor was not interested in providing the originally discussed additional funding and informed the Receiver that he agreed a wind-down was appropriate at this time. Having no other options or alternatives, and having exhausted all reasonably possible leads for additional funding, the Receiver directed that the necessary wind-down commence on the morning of Wednesday, December 5, 2018.

4.    The Wind-Down Process

Without offering insight as to whether ECA would receive relief from HCM2, the DOE requested that the wind-down should attempt to achieve the softest landing for the most students possible. Pursuant to this request, the Receiver made accommodations to the

necessary wind-down plans to allow an expedited teach-out, followed by a domino-closing schedule of the campuses. According to this schedule, those campuses that did not have any academic modules being completed, or graduations be completed, within approximately two weeks of the start date of the wind-down, would be closed on December 7, 2018. All other campuses would remain open until the date the modules or graduations at the respective campuses were completed, after which those campuses would also close. Based on this plan, the anticipated date for closure of all campuses was December 21, 2018. Although this planned closing schedule would abruptly close nearly all of ECA's campuses, this was the softest landing, and likely only landing, reasonably possible at this point.

In order to execute this expedited teach-out and domino-closing schedule, additional funding was needed. The Receiver first communicated with the original investor to secure a smaller amount of additional funding to provide for this closing schedule. The investor was willing to work towards a funding deal to help the students, but the investor was unable to fully commit to the funds. Through daily, and at times hourly, negotiations with the investor, the Receiver was able to reach an agreement to secure funding in order to fully implement the expedited teach-out and domino-closing schedule. At the time of the filing of this Receiver's Initial Report, the Motion to Approve Additional Funding, with an attached proposed order, had been filed and is before the Court.

The Receiver also sought to secure necessary additional funding from the DOE. As the above-mentioned expedited teach-out process was DOE's request, and because ECA was entitled to federal funds for those students that remained enrolled in class for an additional two weeks, the Receiver requested additional federal funding. The DOE appeared to entertain the idea of providing additional federal funding solely for the purpose of the teach-out and wind-

down process. The DOE again requested numerous documents from ECA to review before approval of the funds could be considered. Additionally, a full and complete audit of the supporting documents was also ordered by the DOE as a condition of the federal funds being released. To date, the Receiver has not received a full commitment from the DOE to help fund the teach-out. The DOE has commented that if funds are made available to the Receiver to fund the teach-out, those funds would not likely be available until January.

The wind-down process began Wednesday, December 5, 2018. Based on the domino-closing schedule, approximately three thousand two hundred (3,200) employees were terminated and thirty eight (38) campuses were closed on December 7, 2018. Skeleton crews remained behind to scan and destroy sensitive documents on those campuses that were immediately closed. The campuses that remained open as part of the expedited teach-out process only retained the faculty required to complete the modules and for graduation. All other staff was also terminated. The corporate office was also vastly reduced, leaving only a select few on staff to implement the wind-down to the end.

Due to the abrupt wind-down of the campuses, the response, as was expected, has been shock.  Unfortunately, that feeling of shock has led to vandalism and theft at some of the campuses. The Receiver has directed ECA officials at the affected campuses to report all disturbances with the police, and to file police reports where necessary. At some campuses, additional security has been provided as applicable.

The decision to implement the necessary wind-down process was an extremely difficult decision to make. The Receiver delayed making the decision until the last possible moment to allow additional funding to be secured, from numerous different sources. Unfortunately, the promises of funding never amounted to anything, and the decision to implement the wind-

down had to be made. The consequences from the lack of funding from the investor and the DOE resulted in approximately eighteen thousand students' (18,000) education abruptly ending, and more than three thousand (3,000) employees being unemployed.

### 5. Moving Forward

As the wind-down process proceeds, the Receiver has begun to implement several additional actions. On December 6, 2018, the Receiver sent a letter to all landlords and landlords' counsel to provide an update regarding the operations of ECA. The letter represented the unforeseen hardships discussed above, and how those had directly impacted implementing the Restructuring Plan. In compliance with the Court's desires, the Receiver informed the landlords that following the wind-down, all properties occupied by ECA would be vacated in an orderly and timely manner, and turned over to the property owners/landlords. The Receiver attached to the letter an exhibit that set forth the timeline for all of the currently occupied properties to be returned to the landlords. Attached as Exhibit B and Exhibit C is the letter sent from the Receiver on December 6, 2018, and the schedule for the Receiver to return the properties to the landlords respectively.

The Receiver will support the continued operations of NECB. The Receiver has had direct communications with the DOE to allow NECB to be carved out and allowed to continue to operate pending a future sale. NECB remains accredited by its regional accrediting agency, separate from ACICS. Furthermore, ECA professionals have represented to the Receiver that a sale of NECB would attract substantial attention, with a possible bid ranging between ten to twenty-seven million dollars. Any sale of NECB would add great value to the Receivership Estate. For the Court's benefit, attached as Exhibit D is ECA's twelve-week cash flow forecast

to illustrate the continued funding to NECB, as well as the other ordinary wind-down expenses, as NECB is moved forward through the sale process.

Furthermore, the Receiver is preparing to form a claims process to address the creditors concerns and will address those accordingly. The Receiver anticipates filing a motion to approve a claims procedure whereby creditors may file proofs of claims with the Receiver by certain deadlines to evidence their claims against Defendants in order to participate in the distribution of assets from the Receivership Estate, if any, according to their priority. To facilitate this process, the Receiver expects to solicit bids from and employ a third-party claims processing agent (the "Claims Agent") which will send a Court-approved notice to file claims (the "Notice to File Claims") and accompanying proof of claim form to all known creditors of Defendants. The Claims Agent will assist the Receiver with receiving, processing, and administering all proofs of claims filed by creditors. The Receiver will review and determine the treatment of these claims for distribution.

### III.   RECOMMENDATION

It is the Receiver's recommendation that ECA remain in federal receivership. As noted above, the Receiver has already informed the landlords of his intent to return the properties occupied by ECA back to the landlords' possession. Additionally, the sale of NECB, which would be a great benefit to the receivership estate and all creditors, would not be possible through bankruptcy. The Higher Education Act defines an institution of higher education as one that has not filed for bankruptcy. 20 U.S.C. § 1002(a)(4). Placing ECA in bankruptcy would be a great disadvantage not only to the students and ECA, but to the creditors as well.

Additionally, as discussed above, the Receiver is preparing to move forward with establishing a claims process. The claims process would allow creditors to file proofs of claims

against ECA, for those claims to be reviewed, and approved if applicable. Once the claims process is closed, those approved claims would be paid according to the remaining funds in the Receivership Property.

For these reasons, the Receiver recommends that the best course of action would be to allow ECA to remain in receivership.

Respectfully submitted this 12th day of December, 2018.

JOHN F. KENNEDY
Georgia Bar No. 414830
JAMES F. BANTER
Georgia Bar No. 581797
Counsel to John F. Kennedy, Receiver

JAMES-BATES-BRANNAN-GROOVER-LLP
231 Riverside Drive
P. O. Box 4283
Macon, Georgia  31208-4283
(478) 742-4280 telephone
(478) 742-8720 facsimile
jkennedy@jamesbatesllp.com
jnichols@jamesbatesllp.com
jbanter@jamesbatesllp.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 12, 2018, a true and exact copy of the foregoing document has been served on the counsel to the parties by way of filing on CM/ECF.

This 12th day of December, 2018.

JAMES F. BANTER
Georgia Bar No. 581797
Counsel to John F. Kennedy, Receiver

JAMES-BATES-BRANNAN-GROOVER-LLP
231 Riverside Drive
P. O. Box 4283
Macon, Georgia  31208-4283
jbanter@jamesbatesllp.com

Page **16** of 16

**Education Corporation of America**
**Requested Disbursements Authorization**

| Total Payments | | Paid | | | | |
|---|---|---|---|---|---|---|
| Payables | $ | 5,263,254 | FACILITIES - RENT | $ | 1,842,242 |
| | | | BENEFITS - PREMIUMS | $ | 1,172,733 |
| Bond Collateral | $ | 1,500,000 | MARKETING - LEADS | $ | 679,423 |
| | | | P Card | $ | 213,517 |
| Student Stipends | $ | 863,079 | Insurance | $ | 183,994 |
| | | | UTILITIES | $ | 176,455 |
| Payroll | $ | 14,194,269 | TAXES / LICENSES | $ | 150,162 |
| | | | MARKETING | $ | 150,000 |
| | | | Other | $ | 694,728 |
| *Total Authorized Payments* | $ | 21,820,602 | Total | $ | 5,263,254 |





JOHN F. KENNEDY

JKENNEDY@JAMESBATESLLP.COM
DIRECT DIAL: 478-749-9981

December 6, 2018

**VIA EMAIL AND FIRST CLASS MAIL**

**Re:** *VC Macon GA, LLC v. Virginia College, LLC and Education Corporation of America (the "**Lawsuit**"), Case No. 5:18-cv-00388-TES, United States District Court for the Middle District of Georgia, Macon Division (the "**Court**")*

To whom it may concern:

As you are or should be aware, the undersigned John F. Kennedy, Esq. was appointed in the above referenced action as the Court Appointed Receiver (the "**Receiver**"), of Education Corporation of America, Virginia College, LLC, and New England College of Business and Finance, LLC ("**NECB**") (collectively "**ECA**") pursuant to the *Order Appointing Receiver and Preliminary Injunction* entered by the Court in the Lawsuit on November 14, 2018.

It was the intent of the Receiver to continue operations of the ECA campuses in a calculated wind down of the business which would maximize benefits to the enrolled students and the Receivership Estate and minimize the costs and risks to the creditors, landlords and others of the Receivership Estate. However, as you may have heard, a material change of circumstances have necessitated the controlled closing of the bulk of ECA's operations during the pendency of the receivership. Among many unfortunate events, the Department of Education ("**DOE**") placed ECA's institutions on Heightened Cash Monitoring 2 ("**HCM2**") status which exacerbated ECA's cash flow problems beyond what was originally anticipated. Despite diligent efforts and communications and in person meetings with decision makers in Washington requesting that the DOE provide relief, ECA remains on HCM2 status. Additionally, ECA expected several infusions of capital from external sources; however, due in part to ECA's HCM2 status and the recent loss of accreditation, those sources of funding failed. These circumstances along with several others have resulted in the ultimate decision to cease operations of ECA, except operations of NECB.

Accordingly, the Receiver intends and the Court desires to ensure that properties occupied by ECA will be vacated in an orderly and timely manner as set forth by Exhibit "A" attached to this correspondence, and control of said properties will be turned over to the property owners/Landlords. However, the schedule set forth by Exhibit "A" is subject to change in the circumstance that any external entity (purchaser or acquiring entity) is able to assume control of some or all of ECA operations and assume and satisfy past due liabilities to owners/landlords. Any determination on the sale of ECA assets to an external entity and consequent request for continued operation at any particular location will be made no later than December 22, 2018.

MACON
231 RIVERSIDE DRIVE ■ MACON, GEORGIA 31201
478.742.4280 ■ 478.742.8720

ATLANTA
CHTREE ROAD, NE SUITE 1700 ■ ATLANTA, GEORGIA 30326
404.997.6020 ■ 404.997.6021



ATTORNEYS AT LAW · A LIMI     ·  GEORGIASLAWFIRM.com

ECA will continue to occupy properties leased for the purpose of operating NECB because it is operating separately and capable of being sold for value to the Receivership Estate.

If you have any questions, please do not hesitate to contact Chris Conley in our office by calling the following number of (478) 749-9908.

Sincerely,

John F. Kennedy, Esq.
Receiver

2

| CampusName | CampusNameFull | CampusStreet | CampusCity | CampusState Abbrev | CampusZip | Time Zone | Campus | Last Day Teaching | Campus Evac Date | Campus Population End of November |
|---|---|---|---|---|---|---|---|---|---|---|
| BW - Arlington | Brightwood College - Arlington | 2241 South Watson Road, Suite 181 | Arlington | TX | 76010 | CST | Arlington | 12/7/2018 | 12/13/2018 | 84 |
| BW - Bakersfield | Brightwood College - Bakersfield | 1914 Wible Road | Bakersfield | CA | 93304 | PST | Bakersfield | 12/7/2018 | 12/13/2018 | 93 |
| BW - Baltimore | Brightwood College - Baltimore | 1520 South Caton Avenue | Baltimore | MD | 21227 | EST | Baltimore | 12/7/2018 | 12/13/2018 | 363 |
| BW - Beaumont | Brightwood College - Beaumont | 6115 Eastex Freeway | Beaumont | TX | 77706 | CST | Beaumont | 12/7/2018 | 12/13/2018 | 96 |
| BW - Beltsville | Brightwood College - Beltsville | 4600 Powder Mill Road | Beltsville | MD | 20705 | EST | Beltsville | 12/7/2018 | 12/13/2018 | 526 |
| BW - Broomall | Brightwood Career Institute - Broomall | 1991 Sproul Road, Suite 42 | Broomall | PA | 19008 | EST | Broomall | 12/7/2018 | 12/13/2018 | 318 |
| BW - Brownsville | Brightwood College - Brownsville | 1900 North Expressway, Suite O | Brownsville | TX | 78521 | CST | Brownsvill | 12/7/2018 | 12/13/2018 | 242 |
| BW - Charlotte | Brightwood College - Charlotte | 6070 East Independence Boulevard | Charlotte | NC | 28212 | EST | Charlotte | 12/7/2018 | 12/13/2018 | 306 |
| BW - Chula Vista | Brightwood College - Chula Vista | 555 Broadway, Suite 144 | Chula Vista | CA | 91910 | PST | Chula Vista | 12/7/2018 | 12/13/2018 | 247 |
| BW - Corpus Christi | Brightwood College - Corpus Christi | 1620 South Padre Island Drive, Suite 600 | Corpus Christi | TX | 78416 | CST | Corpus Chr | 12/7/2018 | 12/13/2018 | 346 |
| BW - Dallas | Brightwood College - Dallas | 12005 Ford Road, Suite 100 | Dallas | TX | 75234 | CST | Dallas | 12/7/2018 | 12/13/2018 | 357 |
| BW - Dayton | Brightwood College - Dayton | 2800 East River Road | Dayton | OH | 45439 | EST | Dayton | 12/7/2018 | 12/13/2018 | 91 |
| BW - El Paso | Brightwood College - El Paso | 8360 Burnham Road, Suite 100 | El Paso | TX | 79907 | MST | El Paso | 12/7/2018 | 12/13/2018 | 257 |
| BW - Fort Worth | Brightwood College - Fort Worth | 2001 Beach Street, Suite 201 | Fort Worth | TX | 76103 | CST | Fort Worth | 12/7/2018 | 12/13/2018 | 263 |
| BW - Fresno | Brightwood College - Fresno | 44 Shaw Avenue, Rodeo Plaza Shopping Center | Clovis | CA | 93612 | PST | Fresno | 12/7/2018 | 12/13/2018 | 111 |
| BW - Friendswood | Brightwood College - Friendswood | 3208 FM-528 | Friendswood | TX | 77546 | CST | Friendswoo | 12/7/2018 | 12/13/2018 | 177 |
| BW - Hammond | Brightwood College - Hammond | 7833 Indianapolis Boulevard | Hammond | IN | 46324 | CST | Hammond | 12/7/2018 | 12/13/2018 | 278 |
| BW - Harrisburg | Brightwood Career Institute - Harrisburg | 5650 Derry Street | Harrisburg | PA | 17111 | EST | Harrisburg | 12/7/2018 | 12/13/2018 | 141 |
| BW - Houston | Brightwood College - Houston | 711 East Airtex Drive | Houston | TX | 77073 | CST | Houston | 12/22/2018 | 12/22/2018 | 393 |
| BW - Indianapolis | Brightwood College - Indianapolis | 4200 South East Street | Indianapolis | IN | 46227 | EST | Indianapol | 12/7/2018 | 12/13/2018 | 435 |
| BW - Ingram | Brightwood College - Ingram | 6441 NW Loop 410 | San Antonio | TX | 78238 | CST | Ingram | 12/19/2018 | 12/20/2018 | 341 |
| BW - Laredo | Brightwood College - Laredo | 6410 McPherson Road | Laredo | TX | 78041 | CST | Laredo | 12/7/2018 | 12/13/2018 | 181 |
| BW - Las Vegas | Brightwood College - Las Vegas | 3535 West Sahara Avenue | Las Vegas | NV | 89102 | PST | Las Vegas | 12/7/2018 | 12/13/2018 | 487 |
| BW - Los Angeles | Brightwood College - Los Angeles (Van Nuys) | 15400 Sherman Way, Suite 101 | Van Nuys | CA | 91406 | PST | Van Nyes | 12/21/2018 | 12/22/2018 | 572 |
| BW - McAllen | Brightwood College - McAllen | 1500 South Jackson Road | McAllen | TX | 78503 | CST | McAllen | 12/7/2018 | 12/13/2018 | 283 |
| BW - Modesto | Brightwood College - Modesto | 5172 Kiernan Court | Salida | CA | 95368 | PST | Modesto | 12/7/2018 | 12/13/2018 | 312 |
| BW - Nashville | Brightwood College - Nashville | 750 Envious Lane | Nashville | TN | 37217 | CST | Nashville | 12/7/2018 | 12/13/2018 | 277 |
| BW - Palm Springs | Brightwood Career Institute - Palm Springs | 2475 East Tahquitz Canyon Way | Palm Springs | CA | 92262 | PST | Palm Sprin | 12/7/2018 | 12/13/2018 | 160 |
| BW - Philadelphia | Brightwood College - Philadelphia | 3010 Market Street | Philadelphia | PA | 19104 | EST | Philadelph | 12/7/2018 | 12/13/2018 | 359 |
| BW - Philadelphia Mills | Brightwood Career Institute - Philadelphia Mills | 177 Franklin Mills Boulevard | Philadelphia | PA | 19154 | EST | Philadelph | 12/7/2018 | 12/13/2018 | 518 |
| BW - Pittsburgh | Brightwood Career Institute - Pittsburgh | 933 Penn Avenue | Pittsburgh | PA | 15222 | EST | Pittsburgh | 12/7/2018 | 12/13/2018 | 116 |
| BW - Riverside | Brightwood College - Riverside | 4040 Vine Street | Riverside | CA | 92507 | PST | Riverside | 12/13/2018 | 12/15/2018 | 312 |
| BW - Sacramento | Brightwood College - Sacramento | 4330 Watt Ave, Suite 400 | Sacramento | CA | 95821 | PST | Sacrament | 12/7/2018 | 12/13/2018 | 191 |
| BW - San Diego | Brightwood College - San Diego | 9055 Balboa Avenue | San Diego | CA | 92123 | PST | San Diego | 12/20/2018 | 12/21/2018 | 764 |
| BW - San Pedro | Brightwood College - San Pedro | 7142 San Pedro Avenue, Suite 100 | San Antonio | TX | 78216 | CST | San Pedro | 12/7/2018 | 12/13/2018 | 331 |
| BW - Towson | Brightwood College - Towson | 803 Glen Eagles Court | Towson | MD | 21286 | EST | Towson | 12/7/2018 | 12/13/2018 | 184 |
| BW - Vista | Brightwood College - Vista | 2022 University Drive | Vista | CA | 92083 | PST | Vista | 12/7/2018 | 12/13/2018 | 414 |
| ECO - Denver | Ecotech Institute | 1400 South Abilene Street | Aurora | CO | 80012 | MST | Eco - Denv | 12/7/2018 | 12/13/2018 | 178 |
| GAA - Dallas | Golf Academy of America in Dallas | 1861 Valley View Lane, Suite 100 | Farmers Branch | TX | 75234 | CST | GAA - Dalla | 12/14/2018 | 12/18/2018 | 72 |
| GAA - Myrtle Beach | Golf Academy of America in Myrtle Beach | 1900 Mr. Joe White Avenue | Myrtle Beach | SC | 29577 | EST | GAA - Myrt | 12/14/2018 | 12/18/2018 | 109 |
| GAA - Orlando | Golf Academy of America in Orlando | 510 South Hunt Club Blvd. | Apopka | FL | 32703 | EST | GAA - Orla | 12/14/2018 | 12/18/2018 | 82 |
| GAA - Phoenix | Golf Academy of America in Phoenix | 2031 N. Arizona Ave., Ste. 2 | Chandler | AZ | 85225 | MST | GAA - Phoe | 12/14/2018 | 12/18/2018 | 51 |
| GAA - San Diego | Golf Academy of America in San Diego | 1950 Camino Vida Roble | Carlsbad | CA | 92008 | PST | GAA - San I | 12/14/2018 | 12/18/2018 | 85 |
| VC - Augusta | Virginia College in Augusta | 2807 Wylds Road | Augusta | GA | 30909 | EST | Augusta | 12/18/2018 | 12/19/2018 | 423 |
| VC - Austin | Virginia College in Austin | 14200 N. Interstate Hwy. 35 | Austin | TX | 78728 | CST | Austin | 12/18/2018 | 12/19/2018 | 161 |
| VC - Baton Rouge | Virginia College in Baton Rouge | 9501 Cortana Place | Baton Rouge | LA | 70815 | CST | Baton Roge | 12/18/2018 | 12/19/2018 | 181 |
| VC - Biloxi | Virginia College in Biloxi | 920 Cedar Lake Road | Biloxi | MS | 39532 | CST | Biloxi | 12/7/2018 | 12/13/2018 | 134 |
| VC - Birmingham | Virginia College in Birmingham | 488 Palisades Blvd. | Birmingham | AL | 35209 | CST | Birmingham | 12/18/2018 | 12/19/2018 | 450 |
| VC - Charleston | Virginia College in Charleston | 6185 Rivers Avenue | North Charleston | SC | 29406 | EST | Charleston | 12/12/2018 | 12/14/2018 | 221 |
| VC - Chattanooga | Virginia College in Chattanooga | 721 Eastgate Loop Road | Chattanooga | TN | 37411 | EST | Chattanoo | 12/18/2018 | 12/19/2018 | 103 |
| VC - Columbia | Virginia College in Columbia | 7201 Two Notch Road | Columbia | SC | 29223 | EST | Columbia | 12/18/2018 | 12/19/2018 | 130 |


EXHIBIT C

| VC - Columbus | Virginia College in Columbus | 5601 Veterans Parkway | Columbus | GA | 31904 EST | Columbus | 12/18/2018 | 12/19/2018 | 159 |
|---|---|---|---|---|---|---|---|---|---|
| VC - Florence | Virginia College in Florence | 2400 David H. McLeod Blvd. | Florence | SC | 29501 EST | Florence | 12/18/2018 | 12/19/2018 | 212 |
| VC - Ft. Pierce | Virginia College in Fort Pierce | 2810 S. Federal Hwy. | Fort Pierce | FL | 34982 EST | Ft Pierce | 12/18/2018 | 12/19/2018 | 78 |
| VC - Greensboro | Virginia College in Greensboro | 3740 S. Holden Rd. | Greensboro | NC | 27406 EST | Greensbor | 12/18/2018 | 12/19/2018 | 356 |
| VC - Greenville | Virginia College in Greenville | 78 Global Drive | Greenville | SC | 29607 EST | Greenville | 12/18/2018 | 12/19/2018 | 294 |
| VC - Huntsville | Virginia College in Huntsville | 2021 Drake Avenue SW | Huntsville | AL | 35801 CST | Huntsville | 12/18/2018 | 12/19/2018 | 147 |
| VC - Jackson | Virginia College in Jackson | 5841 Ridgewood Road | Jackson | MS | 39211 CST | Jackson | 12/18/2018 | 12/19/2018 | 171 |
| VC - Jacksonville | Virginia College in Jacksonville | 5940 Beach Boulevard | Jacksonville | FL | 32207 EST | Jacksonvill | 12/18/2018 | 12/19/2018 | 518 |
| VC - Knoxville | Virginia College in Knoxville | 5003 N. Broadway Street | Knoxville | TN | 37918 EST | Knoxville | 12/7/2018 | 12/13/2018 | 262 |
| VC - Lubbock | Virginia College in Lubbock | 5005 50th Street | Lubbock | TX | 79414 CST | Lubbock | 12/7/2018 | 12/13/2018 | 380 |
| VC - Macon | Virginia College in Macon | 1901 Paul Walsh Drive | Macon | GA | 31206 EST | Macon | 12/18/2018 | 12/19/2018 | 118 |
| VC - Mobile | Virginia College in Mobile | 3725 Airport Blvd., Suite 165 | Mobile | AL | 36608 CST | Mobile | 12/7/2018 | 12/13/2018 | 267 |
| VC - Mobile Extension | VC - Mobile Extension | 3725 Airport Blvd., Suite 165 | Mobile | AL | 36606 CST | Mobile | 12/18/2018 | 12/19/2018 | -- |
| VC - Montgomery | Virginia College in Montgomery | 6200 Atlanta Highway | Montgomery | AL | 36117 CST | Montgome | 12/18/2018 | 12/19/2018 | 166 |
| VC - Pensacola | Virginia College in Pensacola | 312 E. Nine Mile Road, Ste. 34 | Pensacola | FL | 32514 CST | Pensacola | 12/18/2018 | 12/19/2018 | 125 |
| VC - Richmond | Virginia College in Richmond | 7200 Midlothian Turnpike | Richmond | VA | 23225 EST | Richmond | 12/18/2018 | 12/19/2018 | 391 |
| VC - Savannah | Virginia College in Savannah | 14045 Abercorn St., Ste. 1532 | Savannah | GA | 31419 EST | Savannah | 12/18/2018 | 12/19/2018 | 355 |
| VC - Shreveport | Virginia College in Shreveport/Bossier City | 2950 E. Texas St., Ste. C | Bossier City | LA | 71111 CST | Shreveport | 12/7/2018 | 12/13/2018 | 162 |
| VC - Spartanburg | Virginia College in Spartanburg | 8150 Warren H. Abernathy Hwy. | Spartanburg | SC | 29301 EST | Spartanbur | 12/7/2018 | 12/13/2018 | 102 |
| VC - Tulsa | Virginia College in Tulsa | 5124 S. Peoria Avenue | Tulsa | OK | 74105 CST | | | | -- |

| ECA | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-Week Cash Forecast | | | | | | | | | | | | | |
| ($ in 000's) | | | | | | | | | | | | | |
| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| Week Ending | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 3/1 | Total |
| **RECEIPTS** | | | | | | | | | | | | | |
| Title IV | $ - | $ - | $ - | $ - | $ 2,000 | $ - | $ - | $ - | $ - | | | | $ 2,000 |
| Other/Ins | 700 | - | - | - | - | - | - | - | - | - | - | - | $ 700 |
| TOTAL RECEIPTS | 700 | - | - | - | 2,000 | - | - | - | - | - | - | - | 2,700 |
| | | | | | | | | | | | | | |
| **DISBURSEMENTS** | | | | | | | | | | | | | |
| Payroll | (4,600) | (1,230) | (467) | - | - | - | - | - | | | | | $ (6,297) |
| Vacation | (2,413) | | (600) | | | - | - | - | | | | | $ (3,013) |
| Utilities | (50) | - | - | - | - | - | - | - | | | | | $ (50) |
| Healthcare Benefits | (320) | (200) | (150) | (128) | (102) | (77) | (57) | (43) | (32) | (24) | (18) | (344) | $ (1,495) |
| Total Operating Expenses | (7,383) | (1,430) | (1,217) | (128) | (102) | (77) | (57) | (43) | (32) | (24) | (18) | (344) | (10,855) |
| | | | | | | | | | | | | | |
| **Operating Cash Flow** | (6,683) | (1,430) | (1,217) | (128) | 1,898 | (77) | (57) | (43) | (32) | (24) | (18) | (344) | (8,155) |
| | | | | | | | | | | | | | |
| Debt Service | | | | | | | | | | | | | |
| Revolver Borrowing | 7,000 | | | | | | | | | | | | $ 7,000 |
| | | | | | | | | | | | | | |
| TOTAL DISBURSEMENTS | (383) | (1,430) | (1,217) | (128) | (102) | (77) | (57) | (43) | (32) | (24) | (18) | (344) | (10,855) |
| | | | | | | | | | | | | | |
| **Restructure Cash Utilization** | | | | | | | | | | | | | |
| Professional Fees | (290) | (124) | (269) | (149) | (124) | (124) | (144) | (110) | (10) | (10) | (10) | (807) | $ (2,171) |
| Wind Down Expenses | (181) | (183) | (181) | (173) | (161) | (152) | (152) | (137) | (108) | (47) | (30) | | $ (1,505) |
| D&O Tail coverage | (3,335) | | | | | | | | | | | | $ (3,335) |
| NECB Transition Services | (59) | (57) | (54) | (53) | | | | | | | | | $ (223) |
| NECB Working Capital | (257) | (257) | (257) | (257) | (257) | (257) | | | | | | | $ (1,541) |
| Total Restructure Cash Utilization | (4,121) | (621) | (761) | (632) | (542) | (533) | (296) | (247) | (118) | (57) | (40) | (807) | (8,775) |
| | | | | | | | | | | | | | |
| **Beginning Cash Balance** | 8,930 | 5,126 | 3,075 | 1,097 | 338 | 1,694 | 1,084 | 731 | 441 | 291 | 209 | 151 | 8,930 |
| **Plus/Minus Net Cash Flow** | (3,804) | (2,051) | (1,978) | (759) | 1,356 | (609) | (353) | (290) | (150) | (81) | (58) | (1,151) | (9,930) |
| **Ending Cash Balance** | $ 5,126 | $ 3,075 | $ 1,097 | $ 338 | $ 1,694 | $ 1,084 | $ 731 | $ 441 | $ 291 | $ 209 | $ 151 | $ (1,000) | $ (1,000) |



EXHIBIT
D

tabbies

C:\Users\pbunn\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\MKIKVCWY\Shutdown_ECA_1211 vF
12/12/2018
8:08 AM