## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **VC MACON GA, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **5:18-cv-00388-TES** |
| **VIRGINIA COLLEGE, LLC; and** | ) | |
| **EDUCATION CORPORATION OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### RESPONSE IN OPPOSITION TO EAGLE CLEANING SERVICE, INC.'S
### MOTION FOR LEAVE TO FILE LEGAL ACTION AGAINST RECEIVER

John F. Kennedy, acting solely in his capacity as court-appointed receiver (the "Receiver") hereby submits this response in opposition to Eagle Cleaning Service, Inc.'s ("Eagle") *Motion for Leave to File Legal Action Against Receiver* (the "Motion"). (Doc. 146.) In support thereof, the Receiver states as follows:

### INTRODUCTION

Eagle is a creditor of the Receivership Estate, among potentially tens of thousands of other potential creditors. As Eagle has admitted, Eagle has no claim against the Receiver separate and apart from its claim against the Receivership Estate. Eagle was aware of the receivership and nonetheless continued providing services to the Receivership Estate. In doing so, Eagle accepted the risk of nonpayment. When Defendants' institutions were abruptly and unexpectedly shut down due to circumstances outside of the Receiver's control, Eagle's invoices allegedly went unpaid. Thus, to the extent Eagle has a claim for services provided to the Receivership Estate, it is against the Receivership Estate only. As discussed herein, a claims procedure is being put into place that will allow alleged creditors to file their claims and seek payment from the

Receivership Estate. As such, Eagle's claims should be brought through the claims process and not as a separate suit against the Receiver. Eagle's Motion is, therefore, due to be denied.

## BACKGROUND

1.      On November 6, 2018, Education Corporation of America and Virginia College, LLC (collectively, "ECA") filed their *Emergency Motion for the Appointment of a Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction* (the "Receiver Motion"), wherein ECA sought the appointment of a receiver over its assets. (*See* Doc. 10.)

2.      On November 14, 2018, the Court entered the *Order Appointing Receiver and Preliminary Injunction* (the "Receivership Order"), under which John F. Kennedy was appointed Receiver over the receivership estate (the "Receivership Estate"). (*See* Doc. 26.)

3.      Based on the Receivership Order, ECA was to continue to operate, through the Receiver, by implementing a restructuring plan that would allow twenty-six campuses to achieve a teach-out and orderly closure and allow another forty-five campuses to continue to operate in anticipation of a sale ("Restructuring Plan"). (Doc. 99, pp. 2-3 ("Initial Report"))

4.      As detailed in the Receiver's Initial Report, the Restructuring Plan was no longer viable after the occurrence of several uncontrollable events, including the United States Department of Education's decision to place ECA's institutions on Heightened Cash Monitoring Level 2, the failure to provide additional funding by a previously committed investor, and the withdrawal of ECA's accreditation by the Accrediting Council for Independent Colleges and Schools. (*Id.* at pp. 5-10.)

5.      On December 5, 2018, the Receiver implemented the necessary wind-down of ECA's operations. The Receiver implemented an expedited teach-out process that allowed a

rolling closing of campuses as the current instructional terms were completed. (*Id.* at 10-11.)[1]

6.      Thereafter, on December 13, 2018, the Court entered a *Supplemental Order* that directed ECA to teach out the current terms at each campus and then to turn over the leased properties at the discontinued campuses to the respective landlords (the "Supplemental Order"). (Doc. 104, pp. 2.)

7.      On February 15, 2019, the Receiver, after having dealt with multiple, urgent issues at the outset of the receivership, filed his *Motion for Entry of an Order (1) Approving Proposed Claims Verification Procedures and (2) Granting Related Relief* (the "Claims Process Motion"), seeking the entry of an order approving a proposed claims administration procedures (the "Claims Process"). (Doc. 158.) The Claims Process seeks to provide notice to creditors, establish a uniform, efficient, and coordinated procedure for collecting and verifying filed claims, establish a deadline for submission of claims, enjoin creditors from pursuing or otherwise asserting claims against the Receiver or Receivership Estate other than through the Claims Process, approve the Receiver's distribution of proceeds, and provide a mechanism for the resolution of disputes over the allowance of claims and/or distribution of proceeds of the Receivership Estate. (*Id.* at ¶ 11.) As stated in the Claims Process Motion, the Receiver believes that there may be as many as 50,000 potential creditors of the Receivership Estate. (*Id.* at ¶ 3.)

## ARGUMENT

Eagle's claim is against the Receivership Estate and, therefore, should be brought as part of the Claims Process. As noted above, ECA's institutions were abruptly shut down in December 2018. (*See supra*, at ¶¶ 4-6.) Eagle's invoices for services provided post the appointment of the

---

[1] Although the bulk of ECA's operations have ceased, the Receiver remains in control of New England College of Business and Finance, LLC ("NECB"), the last remaining ECA institution that continues to operate. As the Court is aware, the Receiver has been diligently working to effect a sale of NECB so as not to displace its students or disrupt the operations of that school. Thus, ECA remains in federal receivership so that the Receiver may continue to wind-down ECA while actively working to sell NECB. (Doc. 130, pp. 4-6.)

Receiver allegedly have been left unpaid, and it now seeks to sue the Receiver in an effort to be paid. In support, Eagle alleges it had "multiple conversations with agents of the Receiver who requested Eagle continue providing its services" and that "Eagle continued to contact the Receiver's agents and were insured [sic] payment would be made to Eagle on a weekly basis." (Doc. 146, ¶¶ 4, 6.) In support, Eagle attaches an email with a former ECA employee but fails to include any communication with the Receiver or otherwise supporting its contention that the Receiver designated Eagle as a "critical vendor" or otherwise ordered Eagle to continue providing services to the Receivership Estate. (Doc. 146, Ex. A.) Eagle has put forth no evidence to establish a prima facie case that it should be given leave to file a lawsuit against the Receiver under the Barton Doctrine. Eagle is, at most, a mere creditor of the Receivership Estate.

Eagle's claims are based upon the language of the Receivership Order, and Eagle clearly had notice of the Receivership Order on or around November 20, 2018. (Doc. 146, ¶ 7.) Eagle correctly quotes subparagraphs (1) and (2) of the Receivership Order in paragraphs 2-3 of its Motion, but incorrectly interprets them as obligating the Receiver to pay Eagle for its services. Subparagraphs (1) and (2) of the Receivership Order provide for two things with respect to Eagle's claims: (a) the Receiver is <u>authorized</u> to incur and pay expenses of the Receivership Estate; and (b) the Receiver's payment of expenses is <u>subject to the Receiver's business judgment</u>. (*See* Doc. 26, pp. 4-5.) Furthermore, the Receivership Order provides that any claims arising during the course of the receivership are a liability of the Receivership Estate alone:

> [A]ny debts, liabilities, obligations, claims for relief, or other adverse actions incurred by or asserted against the Receiver or the Receivership Estate arising out of or in the course of this receivership, including without limitation, related to the operation and management of the Business, the administration of the Title IV federal student financial assistance programs, or the teach-out of those certain Teach-Out Schools . . . , whether in the name of the Receiver or ECA, **shall be the debt, liability, obligation or otherwise the responsibility of the Receivership Estate only and not the Receiver individually.**

(Doc. 26, p. 11 *emphasis added*.) Indeed, Eagle itself acknowledges that "the **Receivership Estate** is indebted to Eagle . . . ." (Doc. 146, ¶ 8 (emphasis added).) Additionally, Eagle has not attempted to file a claim against the Receiver in his personal capacity, but has requested leave "to file a Complaint against John F. Kennedy, in his capacity as receiver [. . . .]" (Doc. 146, p. 1.) As such, even if the Receiver did authorize Eagle's continued services during the course of the receivership, Eagle's claim is nonetheless the obligation of the Receivership Estate alone. (*Id.*)

Furthermore, the Receiver has established and is seeking Court approval of a comprehensive Claims Process to address the claims of creditors like Eagle. (*See* Doc. 158.) The purpose of the Claims Process is to prevent the filing of multiple suits by creditors and, instead, create a uniform and coordinated process for collecting, verifying, and making distributions, if any, on creditors' claims. (*Id.*) The purpose of the Claims Process is to avoid the time and expense associated with having to respond to these types of Motions, thereby preserving the Receivership Estate's limited resources and promoting judicial economy.

The Receiver's intent to establish a process for administering claims has been stated many times throughout this receivership, including in the <u>initial notice letter</u> that Eagle attached to its Motion <u>and</u> in the Receiver's more recent responses to Eagle's demands. (*See* Doc. 146, Ex's. A, D). While Eagle was aware of a pending procedure to assert its claims, Eagle nonetheless chose to file its Motion. Eagle has cited no authority, law, fact, allegation, or otherwise that should allow its claims to proceed outside the Claims Process. As such, Eagle may assert its claims through the Claims Process and should not be allowed to proceed in a separate action against the Receiver. As such, the instant Motion is due to be denied.

**CONCLUSION**

As the Court is aware, due to unforeseen and unfortunate circumstances outside of the control of the Receiver, the Receiver had to unexpectedly implement the necessary wind-down of ECA's operations. Pursuant to the Receivership Order, Eagle's claim for payment of services rendered post the appointment of the Receiver is against the Receivership Estate alone. Furthermore, the proposed Claims Process the Receiver has respectfully filed before the Court is the best and proper avenue to handle Eagle's claim. Based on the foregoing, the Receiver respectfully requests the Court deny Eagle's Motion in full.

Respectfully submitted this 27th day of February, 2019.

JOHN F. KENNEDY, Court Appointed Receiver
Georgia Bar No. 414830
JAMES F. BANTER
Georgia Bar No. 581797
Counsel to John F. Kennedy, Receiver

JAMES-BATES-BRANNAN-GROOVER-LLP
231 Riverside Drive
P. O. Box 4283
Macon, Georgia  31208-4283
(478) 742-4280 telephone
(478) 742-8720 facsimile
jkennedy@jamesbatesllp.com
jbanter@jamesbatesllp.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the

CM/ECF system on this the 27th day of February 2019, which will send email notification to all

counsel of record.

JAMES F. BANTER
Georgia Bar No. 581797
Counsel to John F. Kennedy, Receiver

JAMES-BATES-BRANNAN-GROOVER-LLP
231 Riverside Drive
P. O. Box 4283
Macon, Georgia  31208-4283
(478) 742-4280 telephone
(478) 742-8720 facsimile
jkennedy@jamesbatesllp.com
jbanter@jamesbatesllp.com

7