UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| VC MACON, GA, LLC, | * | Civil Action No. |
| *Plaintiff*, | * | 5:18-cv-00388-TES |
| v. | * | |
| VIRGINIA COLLEGE LLC | * | |
| *Defendant.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**CONSUMER PROTECTION DIVISION OF THE
OFFICE OF THE ATTORNEY GENERAL OF MARYLAND'S
OPPOSITION TO RECEIVER'S MOTION TO ENFORCE COURT ORDER**

The Consumer Protection Division of the Office of the Attorney General of Maryland (the "Division"), opposes the Motion to Enforce Court Order (Dkt. No. 248) filed by John F. Kennedy, in his capacity as receiver (the "Receiver") for the Receivership Estate of Education Corporation of America, Virginia College, LLC, and the New England School of Business and Finance (the "Receivership Estate").

The Receiver seeks, through his motion, to extinguish the Division's investigation of Virginia College, LLC, a for-profit entity that offered career-related courses on the internet and at campuses in Maryland and around the country, through enforcement of this Court's Appointment Order.  As is discussed below, the Division is entitled to bring an action against Virginia College to enforce its subpoena in Maryland court based upon the plain language of the Appointment Order, which exempts from its authority "actions in which a state agency is a party and as to which such state is exercising its police or regulatory powers."  Dkt. No. 26, ¶5.  The Division is the Maryland state agency charged with enforcing Maryland's consumer protection laws, including

the Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 through 13-501 (the "CPA"), and its investigation of Virginia College's recruitment, lending, and debt collection practices is a clear exercise of regulatory or police action by a state agency. *See In re Luskin's, Inc.*, 213 B.R. 107, 110-11 (D. Md. 1997).  Accordingly, the Division did not violate or circumvent this Court's order by issuing its subpoena and filing its enforcement action in Maryland and the Receiver's motion should be denied.

## I.   **STATEMENT OF FACTS**

### A.   **The Division Has Broad Subpoena Authority to Protect the Public.**

The Division is responsible for enforcement of Maryland consumer protection laws, including the CPA.  When creating the CPA, the Maryland General Assembly expressly articulated the purpose of the statute, which is to "take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland," as well as "to accomplish these ends and thereby maintain the health and welfare of the citizens of the State."  Com. Law §13-102(b)(3). Consistent with that purpose, the General Assembly gave the Division authority to "[i]nitiate its own investigation of any unfair and deceptive trade practice."  Com. Law §13-204.  In furtherance of that authority, the Division, "[i]n the course of any . . . investigation . . . may subpoena witnesses, administer oaths, examine an individual under oath, and compel production of records, books, papers, contracts, and other documents."  Com. Law §13-405(a).  The General Assembly further stated that the CPA "shall be construed and applied liberally to promote its purpose."  Com. Law §13-105.  These provisions demonstrate the General Assembly's clear intention that the Consumer Protection Act provide strong protection for Maryland consumers against unfair or deceptive practices.

Maryland courts have recognized that agencies such as the Division have broad subpoena authority.  The Maryland Court of Appeals describes an agency's authority to subpoena records as, "include[ing] the power of inquisition, if one chooses to call it that, which is not derived from the judicial function." *Vulcan Waterproofers, Inc. v. Md. Home Imp. Comm'n*, 253 Md. 204, 210 (1969), quoting *United States v. Morton Salt Company*, 338 U.S. 632, 641-643 (1950).  The agency's authority "is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on *suspicion* that the law is being violated, or even just because it wants assurance that it is not." *Id.*  (emphasis added).  The statutory delegation of "investigative and accusatory duties . . . to an administrative body [permits the agency to] . . . take steps to inform itself as to whether there is probable violation of the law." *Id. See also, Unnamed Attorney v. Attorney Grievance Comm'n*, 409 Md. at 522-23, citing *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991).  Unless a court "determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of . . .  [the agency's] investigation. . ." a request contained within an administrative subpoena must be considered relevant and, therefore, reasonable. *Unnamed Attorney*, 409 Md. at 522-523, quoting *R. Enterprises*, 498 U.S. at 301.

**B.      The Division Utilized its Broad Police Authority to Investigate Virginia College's Potential Unfair, Abusive, or Deceptive Trade Practices.**

Virginia College, an affiliate of the Education Corporation of America, operated three ground campuses in Maryland under the name Brightwood College, one of which was in Baltimore City.  These campuses, until recently, enrolled approximately 1,000 Maryland students.  Virginia

College abruptly closed these campuses in December 2018, immediately after it lost its accreditation status with the American Council for Independent Colleges and Schools [1]

The Division initiated the investigation that gave rise to this subpoena enforcement action, because it has reason to believe that Virginia College engaged in and continues to engage in unfair, abusive, and deceptive conduct that, if proven, would violate the CPA.  As is set forth more fully below, these practices likely: (1) occurred during the recruitment process; (2) occurred throughout students' matriculation; and (3) continue to occur each time Virginia College attempts to collect upon student loan debts allegedly owed by students who attended the school.[2]

First, Virginia College made representations to prospective Maryland students that may have been false or otherwise constituted unfair, abusive, or deceptive practices, pursuant to the CPA.  For instance, Virginia College may have misrepresented that:

(1) its application for accreditation with a new accreditor was "currently on schedule to be accepted" (Brightwood College Catalog, Exhibit 1, p. 6) when in actuality its application was denied based upon 232 weaknesses, showing noncompliance with 23 of the accreditor's 33 accreditation standards (ACCET Initial Accreditation Denial (May 1, 2018), attached hereto as Exhibit 2, p. 2);

(2) it would provide career development services to students after they graduated to "assist students in their job search" (Catalog, Exhibit 1, p. 27) when, based upon the closure of all of Virginia College's campuses, it no longer appears to be doing that;

---

[1] Liz Hill, a spokesperson for the U.S. Department of Education, publicly criticized the manner in which Virginia College choose to undertake the sudden closure:  "Instead of taking the next few months to close in an orderly fashion, ECA took the easy way out and left 19,000 students scrambling to find a way to finish the education program they started," she said.  https://www.npr.org/2018/12/06/674343283/for-profit-college-chain-education-corporation-of-america-announces-shut-down;  see also  https://www.wbaltv.com/article/brightwood-college-suddenly-closes-leaving-students-frustrated/25425539

[2] Although the Division will generally discuss some of the basis for its investigation, the Division need not allege specific instances of wrongdoing before beginning an investigation because to do so would "hamstring [the Division's] investigative authority." *Washington Home Remodelers, Inc. v. State, Office of Attorney Gen., Consumer Prot. Div.*, 426 Md. 613, 633-34 (2012).  To require an allegation of specific wrongdoing at this early stage would defeat the purpose of the administrative discovery process, which is to ascertain whether or not the law is being violated. *Id.* at 634 (explaining that the subpoena authority of the Division "is more analogous to the Grand Jury, *which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not*") (emphasis in original); *see also Consumer Protection Division v. Consumer Publishing Co, Inc.*, 304 Md. 731, 756-59 (1985); *Devine Seafood, Inc. v. Attorney General*, 37 Md. App. 439, 447-48 (1977) (stating that the Division may "act upon its own initiative, from whatever stimulus, to investigate individual instances or broader patterns of unfair or deceptive practices").

4

(3) its programs were "taught by qualified instructors," (Catalog, Exhibit 2, p. 27) when in actuality an accreditor found a widespread shortage of qualified instructors, a faculty yearly turnover rate of 84 percent in one campus, and an instance of a program director for a medical billing and coding program with no experience in medical billing and coding (ACCET Denial, Exhibit 2, p. 10);

(4) it had "facilities and resources that respond to the needs of students, faculty, and staff," (Catalog, Exhibit 1, p. 4) when in actuality an accreditor found multiple Virginia College campuses failed to deliver the promised hands-on training and resources for its programs (ACCET Denial, Exhibit 2, p. 21, 31);  and,

(5) students had "the right to quality education," which included "quality programs; appropriate instructional methodologies and content" (Catalog, Exhibit 1, p. 16) when in actuality, metrics published by the U.S. Department of Education roundly showed poor quality.[3]

Second, Virginia College may have made representations to matriculating Maryland students to ensure that they would not leave the school or to ensure that they would transfer into another school owned by Virginia College or its parent company and may have made omissions to both matriculating and prospective students.  For instance, Virginia College may have:

(1) failed to inform students who were attending its online school when it was being closed that they had a right to obtain a discharge of their federal student loans or could transfer to any school that would accept them, instead of only being able to transfer to the New England College of Business and Technology, which was another school owned by Virginia College's parent company;

(2) misrepresented to students whose ground campuses were closing to determine transferability of credits to another institution and, if the student was not satisfied with the transfer option, the school would refund all tuition paid;

(3) failed to fully inform students about its declining financial position and the U.S. Department of Education's determination that the school failed to meet required financial responsibility standards, which allowed the school to access federal money only through a restricted process called "Heightened Cash Monitoring" *See, e.g.,* Emergency Motion for the Appointment of a Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction, Dkt No. 10, p. 9-10; Receiver's Initial Report, Dkt. No. 99, p. 6; and,

---

[3] Only 30 out of 193 programs offered by Virginia College passed the U.S. Department of Education's test called the "Gainful Employment Rule," which compared the median amount of student loan debt incurred by a graduate to the median income earned by graduates.  https://www.chronicle.com/article/Here-Are-the-Programs-That/238851. Virginia College's cohort default rate ranged from 14 to 34.2 percent, which was far above the national rate of 10.8% https://www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html.

(4) failed to inform students about a directive from its accreditor, ACICS, on May 8, 2018, to "show-cause" why its accreditation should not be withdrawn and what the consequences from a loss of accreditation, which occurred seven months later,[4] would entail.[5]

Third, Virginia College may be violating the CPA when it collected and each time it continues to collect upon the millions of dollars in student loan debts that former Maryland students owe to the school.  Virginia College owns over $70 million of student debts that are allegedly owed to the school, and, of that $70 million, Virginia College is currently collecting debts allegedly owed by graduates and "those former students that received education" from the school.[6]  *See* Receiver's Amended Expedited Motion for Order to Sell Certain Accounts Receivable, Dkt No. 239, p. 2-3; Receiver's Fourth Report, Dkt. No. 187, p. 7.  This means that Virginia College is actively collecting on student loans allegedly owed to the school that have a total value between $16,865,257 and $37,080,107.  Virginia College's collection of any alleged debt owed by Maryland students could violate the Maryland Consumer Debt Collection Act (and thereby violate the Maryland Consumer Protection Act) if, among other things, Virginia College has knowledge that it has no right to collect upon the debt or if it makes a false, deceptive, or misleading representation in connection with the collection of the debt.  *See* Md. Code Ann. Com.

---

[4] Due to various deficiencies including unresolved concerns with the "systematic implementation and demonstration of compliance in 12 areas across various campuses including student progress, outcomes, [its hybrid online platform's] impact, student satisfaction, certification and licensure, and staff turnover," Virginia College's accreditor withdrew accreditation on December 4, 2018.  *See* ACICS Accreditation Withdrawal Letter, attached hereto as Exhibit 3.

[5] ACICS Letter of Institutional Show-Cause Directive, May 8, 2018, http://www.acics.org/uploadedFiles/Actions/00010582_VirginiaColl_SC_AdverseInformation.pdf

[6] The only student debts that Virginia College made clear that it is not collecting are those allegedly owed by students who attended the school within one-hundred and twenty days of the closure, or those students' accounts that had been inactive for over one year.  Despite this being the only limitation on the debt being collected, Virginia College claimed in its motion to enforce the court order that it is "not attempting to collect any Student AR from students in Maryland other than in the ordinary course of business" and that this "means there is no ongoing or future behavior to discourage or regulate by the enforcement of a police power."  Dkt. No. 248, p. 11.

Law §14-202; §13-301(14)(iii).[7]  Virginia College may have knowledge that it does not have a right to collect upon the student debt, or may be making false, misleading, or deceptive representations when collecting the student debt, through its previous unfair, abusive, or deceptive conduct it inflicted upon students when they enrolled and took out the debt or stayed enrolled and took out more of the debt.

In order to investigate the concerns discussed above, on May 13, 2019, the Division issued an administrative subpoena (the "subpoena").  *See* Administrative Subpoena, attached as <u>Exhibit 4</u>.  The Division's subpoena seeks the following information relevant to its investigation:

- Information concerning Virginia College's corporate organization, structure and ownership. *See* Exhibit 4, Request Nos. 1-3, 5-6.
- Information concerning Virginia College's current and former employees who may have knowledge of facts relevant to the Division's investigation.  *Id.* at Request No. 4.
- The descriptions of Virginia College's course offerings to Maryland students.  *Id.* at Request Nos. 7-8.
- The materials used to advertise or market Virginia College's educational services to Maryland students.  *Id.* at Request Nos. 9-10.
- Documents related to certain representations made by the school to Maryland students, including the payment of background checks, change to a new accreditor, promises about the quality of the education, and notifications about the pending closure.  *Id.* at Request Nos. 11-12, 16-20.
- A standard (blank) version of the enrollment agreement used with Maryland students. *Id.* at Request No. 13.
- Documents identifying Maryland consumers who purchased services from Virginia College, the services purchased, and the amounts the consumer paid and documents relating to the prices Virginia College charged consumers for its services.  *Id.* at Request Nos. 14-15.
- Documents related to the school's compliance with a U.S. Department of Education regulation. *Id.* at Request No. 21.
- Documents related to the closure of any of the school's campuses that enrolled Maryland students.  *Id.* at Request Nos. 22-25.

---

[7] Virginia College has made clear that it intends to sell $37,080,107 of student debts allegedly owed to the school and identified a potential buyer of that debt on August 30, 2019.  *See* Motion to Sell, Dkt No. 239; Notice of Potential Purchaser of Collectable AR, Dkt. No. 257.  Any purchaser of the of student debt would also need to comply with all provisions of the Maryland Consumer Debt Collection Act and the CPA, including the provisions related to collection of a debt that it has knowledge it has no right to collect and the relevant provisions of the Fair Debt Collections Act. If a sale of the debt is permitted by this Court, the Division would have the authority to continue this investigation to ensure that any buyer complies with Maryland law, and would have the authority to issue an administrative subpoena to the buyer of the student debt.

- Employee training materials.  *Id.* at Request No. 26
- Documents that relate to other law enforcement investigations and consumer complaints. *Id.* at Request Nos. 27-29.

In order to minimize Virginia College's burden when responding, the subpoena also offered it the opportunity to provide lists of some of the requested information and limited other requests to the production of forms or standardized documents.  *See id.* at Request Nos. 3-7, 13-15.

After agreeing to one extension of time for Virginia College to respond to the subpoena, the Division agreed that Virginia College could limit its initial response to the subpoena to seven requests.  Despite that offer, Virginia College has failed to produce any documents in response to the subpoena.[8]  As a result, the Division filed a petition to enforce the administrative subpoena in the Circuit Court for Baltimore City.

## II.    <u>ARGUMENT</u>

### A.    **The Division's Issuance of the Subpoena and Filing of the Petition to Enforce that Subpoena are Exercises of its Police and Regulatory Power and are Exempted from the Receiver's Authority to Intervene, Remove, or Transfer to this District.**

The Receiver only has the authority granted to him by the Appointment Order, which provides that the Receiver's authority to intervene in, remove, and/or transfer to the U.S. District Court for the Middle District of Georgia does not exist in "actions in which a state agency is a party and as to which such state is exercising its police or regulatory powers."  Dkt. No. 26, ¶5. Similarly, section 362(a) of the Bankruptcy Code contains a nearly identical limitation on judicial, administrative, or other actions or proceedings brought against a debtor, known as the "automatic

---

[8] The Receiver opaquely claims that he has "informally produced a substantial amount of requested information to the CPD" (Dkt. No 248, p. 6), but it is unclear for what purpose he raises this point.  During a negotiation regarding the amount of student debts that the Receiver would seek to sell, the Receiver provided the Division with two documents containing limited information about the amount and age of the student debts that are allegedly owed to Virginia College.  The Receiver has not claimed that these documents were produced in response to the Division's subpoena, as evidenced by the fact that the Receiver has sought extensions to respond to the entire subpoena, therefore the purpose of the Receiver in mentioning that unrelated exchange of information is unclear.

stay" while section 362(b)(4) provides a nearly identical exception to the automatic stay for actions by a governmental unit to enforce its "police and regulatory power."  *See* 11 U.S.C. §§ 362(a); 362(b)(4).  In enacting Section 362(b)(4), Congress made it clear that the police and regulatory power exception should be broadly construed to permit government to protect the public welfare. Specifically, the legislative history of Section 362(b)(4) states:

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory laws. Thus where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

House Report No. 95–595, 95th Cong. 2nd Sess. at 343, reprinted in 1978 U.S. Code Cong. and Adm. News, 5787, 6299; see also, Senate Report No. 95–989, 95th Cong., 2nd Sess. at 52, reprinted in 1978 U.S. Code Cong. and Adm. News, 5787, 5838; *see also In re Allied Mech. Servs., Inc.*, 38 B.R. 959, 962 (Bankr. N.D. Ga. 1984).[9]  Courts have also recognized that the purpose of this "police-power exception" is to prevent a debtor from frustrating necessary governmental functions. *Securities and Exchange Comm'n v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000).

In determining whether the police-power exception applies, courts have looked to the purposes of the law that the government seeks to enforce, to distinguish between situations in which a state acts pursuant to its police and regulatory power, and where the state acts merely to protect its status as a creditor. *See U.S. ex rel. Fullington v. Parkway Hosp., Inc.*, 351 B.R. 280 (E.D.N.Y. 2006) (citations omitted).  Although it is true that courts have historically applied the "pecuniary purpose" and "public policy" tests to resolve this question, the Receiver's reliance on

---

[9] The Division's use of Bankruptcy Court cases as precedent in this receivership matter is guided by decisions of this Circuit. *See Bendall v. Lancer Mgmt. Grp., LLC,* 523 F. App'x 554, 557 (11th Cir. 2013) ("[g]iven that a primary purpose of both receivership and bankruptcy proceedings is to promote the efficient and orderly administration of estates for the benefit of creditors, we will apply cases from the analogous context of bankruptcy law, where instructive, due to limited case law in the receivership context."

*In re Enron Corp.*, 314 B.R. 524 (S.D.N.Y. 2004) to support the contention that when a matter is not deterrent upon the company being prosecuted it is not exempt from the police-power exception is misplaced because that case contradicted the conclusions of several circuit courts of appeal.  *See, e.g.*, *PG & E Corp.*, 433 F.3d at 1125-26; *Brennan*, 230 F.3d at 71; *Penn Terra*, 733 F.2d at 273. And several district courts, including the Southern District of New York, have since questioned and repudiated the *Enron* court's reasoning in reaching that decision. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 69 F. Supp. 3d 404, 412 n.4 (S.D.N.Y. 2014); *Parkway Hosp., Inc.*, 351 B.R. at 289 n.8.

Under any test, the Division's investigation of Virginia College is clearly brought for a public police purpose because it was commenced to determine whether the CPA has been violated and *continues* to be violated and, upon such a determination, could seek to punish past violations[10] and prevent future and continuing violations of the consumer protection laws through an injunction that could order Virginia College (or another entity) to cease collecting the student loan debts of Marylanders and take other remedial action.  The monetary relief that could be sought by the Division would include restitution for consumers, the purpose of which is not to compensate victims, but to force Virginia College to disgorge amounts it would be unjust for it to keep.  *See Consumer Prot. Div. v. Consumer Publ'g Co., Inc.* 304 Md. 731, 776 (1984).

Under virtually the same circumstances as this case, the United States District Court for the District of Maryland, found that the Division, when enforcing the CPA, was exercising "a legitimate use of its police power and/or regulatory power even though it seeks to reduce a monetary claim to judgment" and thus, the action was exempt from the automatic stay pursuant to

---

[10] Even if the Division was only seeking money damages for past harms in the form of civil penalties in an enforcement action, the enforcement action is a legitimate use of its police or regulatory power. *See General Motors*, 69 F. Supp. 3d at 412 (quoting *Missouri ex rel. Koster v. Portfolio Recovery Assocs., Inc.*, 686 F. Supp. 2d 942, 948 (E.D. Mo. 2010).

11 U.S.C. §326(b)(4).  *In re Luskin's, Inc.*, 213 B.R. 107, 110-11 (D. Md. 1997).  "When seeking restitution . . . the Consumer Protection Division is asserting more than a pecuniary interest of the State. In addition to halting unfair trade practices that violate the Maryland Consumer Protection Act, it is attempting to 'implement the broader statutory purpose of protecting the public interest.'"  *Id.*  In another similar case, the court held that a consumer protection action brought by the Attorney General of Massachusetts was a police action based upon not only the seeking of the restitution of money illegally obtained but also the Commonwealth "using its police and regulatory power to deter future unlawful conduct and is, therefore, primarily seeking to protect the public welfare."  *Commonwealth of Massachusetts v. New England Pellet, LLC*, 409 B.R. 255, 259 (D. Mass. 2009).

The vast majority of cases on this topic agree with the Division's position.  *See e.g.*, *Consumer Publ'g Co., Inc.*, 304 Md. at 779; *City & Cnty. Of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1125-26 (9th Cir. 2006) (holding that because "restitution will benefit the public welfare by penalizing past unlawful conduct and deterring future wrongdoing," a governmental action under its unfair competition law "is fundamentally a law enforcement action designed to protect the public and not to benefit private parties); *Brennan*, 230 F.3d at 71 ("Where a government unit is suing a debtor to prevent or stop violation of fraud, . . . consumer protection, . . . or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action of proceeding is not stayed under the automatic stay."); *Brock v. Rusco Industries, Inc.*, 842 F.2d 270, 273 (11th Cir. 1988) (holding that a lawsuit brought by the Secretary of Labor "to protect legitimate businesses from unfair competition and to enforce the federal law regarding minimum wage" was exempted from the automatic stay); *Equal Employment Opportunity Comm'n v. McLean Trucking Co.*, 834 F.2d 398, 403 n. 9 (4th Cir. 1987) (holding that even where suits

were initiated after the filing of the bankruptcy, the "exemption of EEOC's enforcement actions against McLean from the automatic stay provision of § 362(a) 'vindicate[s] the public interest in preventing employment discrimination'"); *Penn Terra Ltd. v. Dep't of Envtl. Res., Com. Of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984) (holding that the exceptions to the automatic stay should be construed liberally and in favor of the States' exercise of their police powers when it found that actions taken by a state to enforce an injunction to correct past violations of state environmental protection statutes was within state's police and regulatory powers); *In re First Alliance Mortg. Co.*, 263 B.R. 99, 113 (B.A.P. 9th Cir. 2001) (rejecting the argument that police action by a State that results in "damages inuring to the benefit of third parties" demands a stay); *In re Family Vending, Inc.,* 171 B.R. 907 (Bankr. N.D. Ga. 1994) (action "to enforce governmental regulatory powers, not to collect a debt" is exercise of police or regulatory power and excepted from the automatic stay).

Even the Bankruptcy Court in this District has held that the police-power exemption applies to the commencement of an action where "a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such law." *In re Gallagher*, No. 08-41445, 2010 WL 2507219, *1 (Bankr. M.D. Ga. Jun. 16, 2010). As is set forth above, an action the Division could commence following its investigation could seek to enjoin Virginia College's past, present, and continuing unfair, abusive, or deceptive trade practices, and to disgorge monies that it has no right to keep. Accordingly, under any analysis, the purpose of the Division's investigation is to protect the public and is not for pecuniary reasons and, therefore, is a police action.

The case law is no different when analyzing the issuance and enforcement of an administrative subpoena, and courts have recognized that investigations for potential fraud are part of a government agency's police power, and thus fall within the scope of the exception to the automatic stay. *See, e.g., U.S. Dept. of Housing and Urban Development v. Sutton*, 68 B.R. 89, 94 (E.D. Mo. 1986); *In re Poule*, 91 B.R. 83, 87 n.2 (B.A.P. 9th Cir. 1988) ("[T]he stay does not bar government agencies from investigating, punishing and preventing fraudulent activity by bankruptcy debtors."). In *Sutton*, the court considered a petition to enforce an administrative subpoena duces tecum issued by the Department of Housing and Urban Development ("HUD"). 68 B.R. at 91. The court held that issuance of the subpoena was a valid exercise of HUD's police power, and that the automatic stay was not applicable because "investigations for potential fraud fall within the scope of the [police or regulatory power] exception." *See id.* at 94.

Making this dispute all the more baseless is the fact that the Receiver has previously acknowledged in this matter that a subpoena from a state consumer protection agency deserves compliance. On January 7, 2019, the Office of the Attorney General of Alabama issued a subpoena to Virginia College requesting information related to some students who attended Virginia College's online school. Instead of trying to use the Appointment Order to prevent enforcement of the subpoena and claiming that the subpoena was not a police action, the Receiver responded to the subpoena after negotiating a protective order. *See* Protective Order, *See* Dkt. No. 165, p.1. There is no meaningful way to explain the Receiver's change in position from his prior compliance with an Attorney General subpoena, except that he simply does not want to respond to the subpoena from the Division.

The Receiver is also incorrect that the Division is seeking to interfere with the Receiver's exercise of his rights under the Appointment Order. Instead, the Division is seeking, among other

things, information related to potential ongoing violations of the CPA, through violations of the Maryland Consumer Debt Collection Act and the Fair Debt Collection Act committed in Virginia College's collection of any of the student debt.  As a result, the Division instituted its investigation, at least in part, to prevent continuing conduct that harms the public health and safety of Marylanders, namely, the collection by Virginia College upon a debt in a manner that violates Maryland law.

The Division's petition is plainly an action "in which a state agency is a party and as to which such state is exercising its police or regulatory powers," pursuant to paragraph 5 of the Appointment Order.  As a result, the Receiver lacks the authority to enforce its Appointment Order against the Division.

### B.    The Division's Proof of Claim Does Not Serve to Prevent the Division from Filing its Subpoena Enforcement Action.

The Receiver's contention that the Division has subjected itself to the equity jurisdiction of this Court by filing a proof of claim for an unliquidated amount in the pending Chapter 11 proceeding is without merit. The Division's Proof of Claim[11] did not submit the Division to this Court's jurisdiction for the purpose of enforcing its subpoena for at least four reasons.

First, courts have previously permitted the Division to bring an independent action after filing a proof of claim in a bankruptcy.  *See e.g., In re Luskin's, Inc.*, 213 B.R. 107 (D. Md. 1997). In that case, the Division filed a proof of claim seeking $500,000 and damages from Luskins in the form of free airfare or its cash equivalent after Luskins misrepresented consumers' ability to obtain free airfare that it promised when it was advertising for its products.  *Id.* at 109.  The district court reversed a decision of the bankruptcy court that the automatic stay applied and held that "the Consumer Protection Division's enforcement action is a legitimate use of its police power and/or

---

[11] The Division filed one Proof of Claim, but it was docketed twice by the claims Administrator.

regulatory power even though it seeks to reduce a monetary claim to judgment." *Id.* at 111. Like the present case, the Division in *Luskins* was attempting to "prevent future violations of the consumer protection laws" and "is attempting to 'implement the broader statutory purpose of protecting the public interest'" through its independent enforcement action, despite the fact that it also filed a proof of claim. *Id.*

Second, if the Division brought an action for violations of the CPA, it could seek, in addition to monetary damages, an injunction ordering Virginia College (or a subsequent holder of the debt) to cease collecting upon the student loan debts of Marylanders and take other remedial action, which was not sought in its proof of claim. *See* Proof of Claim, attached hereto as Exhibit 5. The Division served the subpoena, at least in part, to obtain documents that would be relevant to the determination of whether an injunction could be ordered related to the collection of debts. As a result, the Division is not using the subpoena or the petition to advance its proof of claim against the Receivership Estate.

Third, even if the Proof of Claim somehow covers everything that the subpoena relates to (which it does not), the filing of a proof of claim does not provide exclusive jurisdiction over all aspects of the claim and courts routinely abstain from hearing a particular matter to acknowledge the right of state courts to determine particular aspects of state law. *See e.g., In re Mystic Tank Lines Corp.*, 544 F.3d 524, 528-29 (3d Cir. 2008) (rejecting the argument that the filing of a proof of claim required the claim required the claim to be litigated in the bankruptcy court); *Penn Terra Ltd. v. Dep't of Envtl. Res., Com. Of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984) (acknowledging the right of the Pennsylvania state court to issue an order compelling the debtor to proceed with remediation of a contaminated site, notwithstanding that the claim for recovery of the costs was pending in the bankruptcy court).

Lastly, the Division made clear in its proof of claim that it had the authority to bring a separate action despite its filing of the claim when it specifically "reserve[d] the right to bring an independent action" based on its "police and regulatory power as a government unit."  Proof of Claim, Exhibit 5, p. 2.  For these reasons, the Division's filing of its proof of claim does not act as a consent to the jurisdiction of this court for a police action relating to an investigation into past, present, and continuing violations of the CPA.

**C.      The Division's Subpoena is Not Detrimental to the Proceedings.**

Virginia College baldly asserts that responding to the Division's subpoena would be disruptive of his efforts in these proceedings.  It fails to mention that the Division offered to limit the Respondent's initial production related to the subpoena to only seven requests related to a limited time period and fails to recognize that the subpoena itself stated that, in lieu of providing certain actual documents, the Respondent could choose to provide a list of documents that contain the information requested.  *See* Administrative Subpoena at Exhibit 4.

To the extent the Respondent may claim that the production of the requested documents will be overly costly to the Respondent (which it has not yet made), Maryland law states:

> "[T]he mere circumstance that compliance with the requirements of the subpoena will be expensive and will interfere with the conduct of respondent's business does not in itself often afford a basis for refusal to enforce the subpoena.  Rather, the courts take into consideration the character of the administrative investigation, the apparent importance to the agency of the documents in question (i.e., their potential relevancy), and the purpose of the agency in issuing the subpoena."

*Equitable Trust Company v. Comm'n on Human Relations*, 287 Md. 80, 93 (1980); *see also E.E.O.C. v. Maryland Cup Corp.*, 785 F.2d 471, 475 (4th Cir. 1986), *citing United States v. Powell*, 379 U.S. 48, 57-58, 85 S.Ct. 248, 254-55 (1964) (holding that the mere fact that it would cost the business $75,000 to respond to the EEOC's subpoena did not establish that the subpoena was

unduly burdensome); *N.L.R.B. v. Carolina Food Processors, Inc.*in , 81 F.3d 507, 513-14 (4th Cir. 1996).  Despite the fact that Virginia College's corporate parent is currently in receivership, it has funds to pay for the search and production of the records requested by the Division in its subpoena. *See* Receiver's cash forecast submitted on August 28, 2019, Dkt. No. 255-1.  There is no basis for Virginia College's broad and baseless claim of "disruption" to overcome the police-power exception to the Appointment Order.

## IV.    <u>CONCLUSION</u>

For the reasons stated herein, the Division did not consent to the exclusive jurisdiction of this court by filing a proof of claim and its subpoena and petition to enforce that subpoena are legitimate police and regulatory actions that are exempted from the Receiver's authority to intervene, remove, or transfer in the Appointment Order.  Accordingly, the Division respectfully requests that this Court decline the Receiver's request that it extinguish the Division's investigation and deny the Receiver's motion to enforce court order.


Dated: September 3, 2019                         Respectfully Submitted,
                                                 BRIAN E. FROSH
                                                 Attorney General of Maryland

                                          By:  */s/ Christopher J. Madaio*
                                                 Christopher J. Madaio
                                                 Maryland Bar No. 1012150208
                                                 Assistant Attorney General
                                                 Office of the Attorney General
                                                 Consumer Protection Division
                                                 200 St. Paul Place, 16th Floor
                                                 Baltimore, MD 21202
                                                 (410) 576-6585
                                                 Cmadaio@oag.state.md.us

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the

CM/ECF system, on this the 3rd day of September 2019, which will send email notification to all

counsel of record.

/s/ *Christopher J. Madaio* _____
Christopher J. Madaio