# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| **VC MACON, GA LLC,**<br><br>*Plaintiff*,<br><br>v.<br><br>**VIRGINIA COLLEGE LLC, and EDUCATION CORPORATION OF AMERICA,**<br><br>*Defendants*. | **CIVIL ACTION NO.**<br>**5:18-cv-00388-TES** |

## ORDER DENYING RECEIVER'S MOTIONS

The Court's Receiver in this complex and involved receivership case, John F. Kennedy, has filed two motions that the Court addresses in this Order.[1] The first is a Motion for Amendment (the "Amendment Motion") [Doc. 355] in which the Receiver asks the Court to clarify that proceeds from certain insurance policies are "assets of and owned by the Receivership Estate."[2] The second is a Motion to Enforce (the "Enforcement Motion") [Doc. 369] two of the Court's previously-filed Orders: its Order Appointing Receiver and Preliminary Injunction (the "Receivership Order") [Doc. 26] and its Order Approving the Claims Administration Procedures (the "Claims Order")

---

[1] On November 14, 2018, the Court appointed Mr. Kennedy to serve as a Receiver for Education Corporation of America; Virginia College, LLC; and New England College of Business and Finance (all collectively referred to as "ECA"). [Doc. 26].

[2] [Doc. 355 at p. 5].

[Doc. 175]. The Enforcement Motion seeks immediate enforcement of the above-mentioned Orders to enjoin a lawsuit filed in the Circuit Court of Cook County, Illinois, (the "Chicago Lawsuit") by Monroe Capital Management Advisors, LLC[3] against the former directors and officers of ECA and Willis Stein & Partners, LLC. As mentioned above, this is a complicated receivership proceeding. And while these latest motions involve the parties' differing interpretations of what constitutes Receivership Property, how we arrived at this point is not readily disputable. Therefore, the Court will only recite the necessary facts.

In 2018, the Court appointed Mr. Kennedy as Receiver. With that appointment, the Court granted him very broad powers to collect, marshal, preserve, and liquidate the assets of the Receivership Estate and to distribute the proceeds of the Receivership Estate's assets for the benefit of all creditors. These motions involve various portions of the Court's Receivership Order designed to protect the Receiver from interference with his appointment via the procedural vehicle of an injunction prohibiting anyone from doing so. Specifically, the Receivership Order prohibits anyone from commencing any action against ECA seeking to "recover a claim against" ECA prior to its entry and "[a]ny act to obtain possession of Receivership Property from the Receiver or to

---

[3] In this Receivership proceeding, Monroe has participated in many capacities: Monroe Capital Management Advisors, LLC, as administrative and collateral agent under the loan facility (as defined below) (the "Monroe Agent"), together with its affiliated lenders under the Loan Facility (the "Monroe Lenders"), its affiliated creditors with claims as Series G Preferred Stockholders (the "Monroe Stockholders"), and Monroe Capital Private Credit Fund II LP ("Monroe II" and, collectively with the Monroe Agent, the Monroe Lenders, and the Monroe Stockholders, Monroe").

interfere with or exercise control, over, Receivership Property."[4] Notably, Monroe did not object to this language when the Court entered the Order.[5]

In 2019, the Court approved the process by which potential creditors could assert claims against the Receivership Estate. The Claims Order enjoined potential claimants "from pursuing or otherwise asserting Claims against the Receiver or Receivership Estate other than through the Claims Process."[6] Ostensibly complying with the Claims Order, Monroe has used it to file two separate claims against ECA: one seeking approximately $27 million to satisfy the remainder of a $32 million loan made to ECA in 2015 and the other seeking approximately $48 million that ECA owes to Monroe under a stock-purchase[7] agreement. Because Monroe "has not received payments for those claims" via the Claims Process, it filed the Chicago Lawsuit in an attempt to recover these debts.[8] In that lawsuit, Monroe "asserts that the defendants [not ECA itself or the Receiver] committed fraud by making representations to Monroe, and fail[ed] to

---

[4] [Doc. 26 at pp. 9–10].

[5] In fact, no other potential creditor has been as active in the Receivership as Monroe and its affiliated entities.

[6] [Doc. 175 at p. 2].

[7] In 2015, Monroe purchased $40 million of ECA stock, and the Chicago Lawsuit seeks to recover that $40 million investment and $8 million in unpaid dividends. *See* [Doc. 377 at p. 5].

[8] [Doc. 377 at p. 5].

3

disclose material information to Monroe, that caused Monroe to enter into the stock-purchase agreement."[9]

In its arguments opposing the Receiver's Enforcement Motion, Monroe stresses that because "[t]he Receiver is not a defendant" in the Chicago Lawsuit and because the suit does not involve Receivership Property, its filing does not violate either the Receivership or Claims Orders.[10]

Prior to ECA's placement into the Receivership, it purchased eight insurance policies providing $81 million[11] in coverage to its directors and officers. Whether the proceeds from these policies are part of the Receivership Estate forms a critical issue in this Receivership proceeding. On this, Monroe takes the position that the Chicago Lawsuit doesn't seek a decision about these insurance proceeds but is only concerned with one thing: to determine whether its named defendants committed fraud.[12] Specifically, Monroe argues, "[i]f Monroe wins, then the Illinois court will issue a judgment against those defendants and order them to pay a sum of money."[13] At that

---

[9] [*Id.*].

[10] [*Id.* at pp. 5, 7–8]; [Doc. 369-3 at p. 2, n.2 ("Plaintiffs affirmatively state that this complaint contains no claim against ECA or any of its schools, and does not seek to obtain possession of, or impose any lien against, any Receivership Property. Instead, this complaint only alleges direct claims, held solely by Plaintiffs, against the specific individuals and entity named herein.")].

[11] Of this amount, $21 million is for the directors and officers only, not ECA itself.

[12] [Doc. 377 at pp. 9–10].

[13] [*Id.* at p. 10].

juncture, Monroe opines that one of two things could happen. Those defendants could make a claim under the insurance policy, "because the [Chicago Lawsuit] held them liable for actions they took on ECA's behalf[,]" at which point the insurance companies would review the policies' terms to decide whether to pay the claim, or they could "pay the judgment using their own personal assets."[14]

The Receiver argues that Monroe is interfering with his ability to administer the Receivership Estate because Monroe seeks to recover against the insurance policies and that those policies belong to the Receivership Estate. Moreover, he also argues that the Chicago Lawsuit is really against ECA, although the Complaint carefully omits ECA as a named party.[15] For example, the Receiver notes that when presenting the "[n]ature of the [a]ction" within the complaint for the Chicago Lawsuit, Monroe claims, multiple times, that "ECA" (not the individually-named defendants) "represented and warranted" various allegations to secure Monroe's investment.[16] Thus, to the Receiver, Monroe is essentially putting ECA on trial without naming it as a party because if Monroe named ECA as a party, its suit would be barred.

Additionally, the Receiver argues that Monroe is interfering with the property of the Receivership Estate because the policies in question are "dwindling" policies, so

---

[14] [*Id.*].

[15] *See* n.10, *supra*.

[16] *See, e.g.,* [Doc. 369-3 at ¶¶ 6–9].

5

that any monies spent by the directors and officers in defending the Chicago Lawsuit reduces the amount of the policies otherwise available to the Receivership Estate.[17] Of course, that begs the question of whether the insurance policies are property of the Receivership Estate in the first place.

However, in reviewing the relevant docket entries in the Chicago Lawsuit, the Court takes judicial notice that every defendant in that suit has filed a motion to dismiss.[18] So, until the state-court judge assigned to the Chicago Lawsuit rules on the pending motions to dismiss, this Court has no idea to what extent the Chicago Lawsuit will survive, if at all. Also, in this Court's experience, motions to dismiss regularly lead to amended complaints that often moot pending motions to dismiss which then give rise to subsequent rounds of dismissal motions. Additionally, named parties can always move to add other parties, and unnamed parties can move to intervene in pending suits to protect their interests. That being said, this Court really has no idea how the Chicago Lawsuit will ultimately shake out until the routine procedural posturing concludes.

In briefing, Monroe relies on the Anti-Injunction Act to argue that this Court is forbidden to enjoin it from pursuing its Chicago Lawsuit and to do so "would trample"

---

[17] While the Court understands that the insurance policies have been reduced by the amount of defense costs in the Chicago Lawsuit and the lowered insurance amounts could be considered "harm" to the Receivership Estate should the Court ultimately determine that the policies make up some of the Receivership Estate's property, the Court also notes that those monies are already spent and are not likely to be recovered. Thus, at this early procedural stage of the Chicago Lawsuit, the Court does not find that any such harm to the Receivership Estate will be ongoing or significantly increase.

[18] *See generally* [Doc. 430-1]; [Doc. 430-2].

important federalism and due process principles.[19] At oral argument, this Court also acknowledged the important federalism issues likely implicated by its decisions on the Receiver's Motions. To be sure, this Court understands that federal courts should tread lightly when it comes to state matters, unless it does so on solid Constitutional and statutory grounds.[20] And until the Court knows the final lay of the procedural land regarding the Chicago Lawsuit, it should rest on its experience and common sense to simply wait and allow the Chicago Lawsuit to settle procedurally before making any critical ruling as to whether Monroe should be allowed to proceed in that forum.

Ultimately, it is this Court's conclusion that the pending motions in the Chicago Lawsuit must first be decided. Who knows? The state-court judge could dismiss Monroe's suit, mooting the Receiver's concerns. Likewise, she could very well rule in favor of Monroe. Or, Monroe could file an amended complaint, and the defendants could file new motions to dismiss. In addition to these scenarios, other parties, including ECA, could be added to the Chicago Lawsuit and that would impact this Court's analysis—only time will tell. Until all of this plays out, this Court simply cannot make a well-reasoned, fact-based decision without knowing all of the relevant facts—especially when any decision will necessarily invoke traditional notions of federalism.

---

[19] [Doc. 377 at pp. 16–20].

[20] [*Id.* at p. 19 (citing *In re Bayshore Ford truck Sales*, 471 F.3d 1233, 1250 (11th Cir. 2006))].

In order to put a fine point on it, the Receiver's Amendment Motion [Doc. 355] and Enforcement Motion [Doc. 369] are **DENIED as premature and without prejudice**. After the Chicago Lawsuit is procedurally settled and the state-court judge decides any pending or future motions to dismiss, the Receiver may refile any motion he feels necessary to protect the Receivership Estate.

**SO ORDERED**, this 19th day of August, 2020.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**