**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **VC MACON GA, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **5:18-cv-00388-TES** |
| **VIRGINIA COLLEGE, LLC; and** | ) | |
| **EDUCATION CORPORATION OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**RECEIVER'S MOTION TO CONFIRM AND APPROVE SETTLEMENT, AND FOR ENTRY OF A BAR ORDER, AND FINDINGS OF FACT**

COMES NOW John F. Kennedy, solely in his capacity as Receiver (the "Receiver") for the Receivership Estate (the "Receivership Estate") of Education Corporation of America, Virginia College, LLC, and New England School of Business and Finance (collectively, "ECA"), and respectfully files this *Motion to Confirm and Approve Settlement, and for the Entry of a Bar Order* (the "Motion").[1]

## I.    INTRODUCTION:

It has been almost four years since ECA, and its subsidiaries, were placed in the protection of this Court by way of a federal receivership. Likewise, almost four years have passed since ECA ceased operations and entered liquidation in December of 2018. Following the closure of ECA in December of 2018, the Receiver, in furtherance of his duties as the Receiver over the Receivership Estate, has investigated, pursued, and asserted causes of action on behalf of ECA and the entire

---

[1] Due to the complexity, and sensitivity, of the issues discussed in this Motion, additional pages are necessary to fully present this Motion to the Court in excess of the page limitation held in Local Rule 7.4. Furthermore, due to the negotiations between the Parties to the Settlement Agreement that concluded in the Settlement Agreement being agreed to on December 16, 2022, the Receiver, respectfully, moves the Court to excuse the requirement that a request for additional pages should have been brought five (5) days in advance of the Motion being filed. Local Rule 7.4.

Receivership Estate, including claims against certain former directors and officers of ECA, *i.e.*, Avy Howard Stein, Christopher Boehm, and Stuart Reed (collectively, the "Individual Defendants"). The Receiver now respectfully moves the Court to confirm the proposed settlement of those claims.

The Receiver has pursued these claims since 2019, which has included participating in three mediations (one pre-suit), filing suit in March of 2021 with this Court, conducting substantial discovery (including filing a motion to compel), and adjudication of the Individual Defendants' motion to dismiss. Following the Receiver's motion to monitor proceeds (Doc. 498, the "Monitor Motion"), the Court ordered the Receiver and the Individual Defendants to participate in the third of three mediations conducted to date.[2] (Doc.498). Interested party, Monroe, also participated.

Following this Court-ordered mediation, and substantial post-mediation negotiations, the Receiver, the Individual Defendants, Monroe, and Willis Stein (the Receiver, Monroe, the Individual Defendants and Willis Stein are sometimes referred to herein collectively as the "Parties" or, singularly, as a "Party") agreed to a settlement. Pursuant to the proposed settlement, the Receiver, and thus the Receivership Estate, will receive twenty-eight million dollars ($28 million) to resolve and settle the Receiver's claims (the "Settlement Payment"). Attached as **Exhibit A** to the Motion is an executed copy of the settlement agreement between the Receiver, Individual Defendants, and Monroe, which the Receiver is moving the Court to approve today (the "Settlement Agreement").  The Receiver, respectfully, moves the Court to approve and confirm this settlement. The Individual Defendants, the applicable D&O Insurers (as defined below), and Monroe consent to this settlement and this Motion.

---

[2] Unless otherwise indicated, capitalized terms used herein have the same meaning provided in the Settlement Agreement that is attached as Exhibit A to this Motion.

The Receiver also moves the Court for the confirmation of additional essential terms of the Settlement Agreement. First, the Receiver moves the Court to find and conclude that the Side A&B Coverage (as defined in the Settlement Agreement) will be fully and completely exhausted upon fulfillment of the Settlement Payment, and receipt by defense counsel for the Individual Defendants and ECA of costs and fees incurred prior to approval of the Settlement Agreement. In so moving, the Receiver, consistent with the Receiver's position in the Motion to Monitor Proceeds (*See* Doc. 498, p. 14), affirms and acknowledges that the Side A Coverage provided by the D&O Policies is not an asset of the Receivership Estate, and that nothing in the Settlement Agreement, or any potential order, would prevent the Individual Defendants from drawing on the Side A Coverage (as defined in the Settlement Agreement), to the extent there remains coverage, in accordance with the terms and conditions of the applicable D&O Policies. Second, the Receiver moves the Court to bar any pending or potential future claims against the Individual Defendants related to ECA or ECA's operations.

The approval of the Settlement Agreement is the only way for the Receivership Estate to receive the substantial infusion of cash in the form of the Settlement Payment, which the Receiver and the Court can then use to distribute to the potential creditors of the Receivership Estate based on the creditors' priority and the Court's claims process (Doc. 175). As the Receiver has noted numerous times in his monthly Receiver's reports -the liquidation of the Receiver's claims is likely the most valuable, and perhaps only, remaining asset of the Receivership Estate. (*See several Receiver's Reports* Docs. 300, 311, 436, 467, 446, 502, 509, 516, 518). The payment of the Settlement Payment is completely contingent on the Court's approval of the Settlement Agreement, which includes the essential terms mentioned above and discussed below, including the entry of a bar order.

## II.        BACKGROUND: [3]

### a.  ECA's Background and the Appointment of the Receiver:

As the Court is well aware, ECA, and its subsidiaries, provided educational services through for-profit colleges. However, due to numerous issues, ECA sought the protection of a federal receivership in the Fall of 2018. On October 16, 2018, ECA commenced the process of entering into receivership by filing a lawsuit against the Department and the Secretary of Education in the United States District Court for the Northern District of Alabama, concurrent with a motion to appoint a receiver (the "Birmingham Case"). The court in the Birmingham Case issued a temporary restraining order on October 19, 2018; however, on November 5, 2018, the Birmingham Case was dismissed and the restraining order expired.

Prior to the initiation of the Birmingham Case, in September 2018, a landlord sued Virginia College in Georgia state court, which action ECA subsequently removed to this Receivership Court, thus initiating the receivership proceeding as styled V*C Macon, GA, LLC v. Virginia College LLC*, No. 5:18-cv-00388-TES, (M.D. Ga. Oct. 18, 2018). (Doc. 1, the "Receivership Proceeding"). The Receivership Proceeding was initially stayed as a result of a temporary restraining order that was issued in the Birmingham Case on October 19, 2018. (Doc. 6). Following dismissal of the Birmingham Case, on November 6, 2018, ECA filed an emergency motion for the appointment of a receiver and an injunction in the Receivership Proceeding. (Doc. 10).   On November 14, 2018, the Receivership Court issued an order granting ECA's preliminary injunction motion and appointed John F. Kennedy as the Receiver of ECA (Doc. 26, the "Appointment Order").

---

[3] The citations below reference numerous federal dockets. Any citations to this Court, the United States District Court for the Middle District of Georgia (the "Receivership Court"), initiating the Receivership Proceeding captioned *VC Macon, GA, LLC v. Virginia College LLC*, No. 5:18-cv-00388-TES, (Doc. 1) (M.D. Ga. Oct. 18, 2018) will be cited as the usual "(Doc. –". Any citations to the Receiver Litigation  (as defined below) will be cited as "(D&O Doc. ----)".

Pursuant to the Appointment Order, the Court granted the Receiver, as the Court's officer, broad powers, including the power to collect, marshal, preserve and liquidate the assets of the Receivership Estate and to distribute the proceeds of the Receivership Estate's assets for the benefit of all creditors. (*See* Doc. 26, pp. 4-7 at ¶¶ 2, 7, 11, 17, 18). Specifically, the Appointment Order vested the Receiver with "all the business, business interest[,] and property of [ECA] wherever located, by whomsoever held, without limitation[.]"  The Appointment Order also granted the Receiver authority "[t]o assert any rights, claims, or choses in action of ECA . . . that are Receivership Property or related thereto, to maintain in the Receiver's name or in the name of ECA any action to enforce any right, claim, or chose in action[.]" This Court retained, and continues to exercise, exclusive jurisdiction over the Receivership Estate:

> IT IS FURTHER ORDERED that the receivership established pursuant to this Order shall remain in effect until further order of this Court and until the receivership is terminated, <u>the Court retains jurisdiction over this matter to (i) amend, supplement or delete any provisions of this Order; (ii) enforce compliance with or punish violations of this Order; (iii) interpret any provision of, and resolve all disputes with respect to, this Order; and (iv) order any additional actions or remedies as may be reasonably necessary or appropriate</u>.

(*See* Doc. 26, p. 15 (emphasis added).)

**b.  The Receiver's Initial Investigation of Claims:**

In execution of his duties, the Receiver has investigated and pursued claims on behalf of the Receivership Estate. Such activities have included the investigation and pursuit of claims against the Individual Defendants. The Receiver's claims allege that the Individual Defendants breached their fiduciary duties of care, loyalty, and good faith owed to ECA and its stakeholders, (D&O Doc. 1, the "Receiver's Claims"). The investigation of these claims began years ago. Beginning as early as 2019, the Receiver investigated his potential claims against the Individual Defendants. On February 21, 2020, the Receiver, and his general counsel James-Bates-Brannan-Groover LLP ("James Bates"), sent an initial notice concerning the Receiver's Claims to the

applicable insurers concerning the Receiver's Claims against the Individual Defendants and other former directors and officers of ECA. This February 2020 letter is attached as **Exhibit B.** This initial letter was followed by an execution of a tolling agreement between the Individual Defendants and other former directors and officers of ECA. On August 27, 2020, James Bates, on behalf of the Receiver, sent a letter, with accompanying documentary support, to provide additional detail and analysis to the Individual Defendants and the other former directors and officers of ECA concerning the Receiver's Claims. This August 27, 2020 letter is attached as **Exhibit C.** Accordingly, the Receiver has reviewed and investigated his claims for several years.

### c.   The Receiver's Counsel:

In the late summer of 2020, as the Receiver's Claims against the Individual Defendants began to take shape, including the complexity and expense/risk to the Receivership Estate of the pursuit of such claims, the Receiver, in his business judgment, decided to engage litigation counsel to assist in the pursuit of these claims. In order to preserve assets of the Receivership Estate, and to eliminate the potential expense risk to the Receivership Estate, the Receiver engaged two firms as litigation co-counsel, Robins Kaplan, LLP ("Robins Kaplan") and James Bates (James Bates and Robins Kaplan are collectively the "Receiver's Counsel"), on a contingency fee basis. The Receiver reported to the Court, and on the docket, that the Receiver had specifically engaged Robins Kaplan as litigation counsel concerning the review and pursuit of the Receiver's Claims in October of 2020. (Doc. 437, pp. 2-3). Robins Kaplan is a national litigation firm specializing in complex commercial litigation. Robins Kaplan, which has been described as being "feared" litigators,[4] has experience representing trustees in litigation against former directors and officers of failed for-profit colleges. (**Exhibit D,** Schutz Affidavit).  In fact, Robins Kaplan represented the

---

[4] https://www.ibj.com/articles/62724-itt-trustee-hires-feared-litigators

bankruptcy trustee in an action against the former directors and officers of the for-profit college Corinthian, and helped secure a $16,250,000.00 million settlement against said directors and officers. (Schutz Aff., ¶ 6). The Receiver also engaged his general counsel, James Bates, as co-litigation counsel. The Receiver's Counsel was engaged on a contingency fee basis for their efforts related to the pursuit and litigation of the Receiver's Claims, so as to not burden the Receivership Estate with their fees, and to remove the risk of fees and expenses from a loss to the Receivership Estate. [5]

### d. **Pursuit of the Receiver's Claims and Filing of the Receiver Litigation :**

Following the engagement of the Receiver's Counsel, the Receiver, with his counsel, participated in a pre-suit mediation concerning his claims against the Individual Defendants and the other former directors and officers of ECA. (Doc. 454). This mediation was held on January 6, 2021 and was not successful. (Doc. 454).

After the failed pre-suit mediation, the Receiver and his counsel filed suit against the Individual Defendants on March 31, 2021, in the United States District Court for the Middle District of Georgia, Case No. 5:21-CV-00106-TES, alleging that the Individual Defendants breached their fiduciary duties of care, loyalty, and good faith owed to ECA and its stakeholders, (the "Receiver Litigation", D&O Doc. 1). This 126-paragraph complaint alleged a minimum of $50 million in damages associated with the closure of ECA and the debts of closed-school loan discharges against ECA. (D&O Doc. 1, p. 35).  Additionally, the complaint alleged damages to be proven at trial, but possibly in the hundreds of millions of dollars as associated and related to the losses asserted against ECA in the Court's claims process. (*Id* at pp. 36-38).

---

[5] The Receiver's Counsel will also file motion to approve attorneys' fees, which, of course, is contingent on the Court approving and confirming the Settlement Agreement.

The Individual Defendants filed a motion to dismiss the Receiver's complaint (the "Motion to Dismiss", D&O Doc. 22). This Motion to Dismiss sought to dismiss the entirety of the Receiver's complaint based on numerous issues. (*Id*). On October 1, 2021, following a complete briefing by both sides, the Court ultimately denied the Motion to Dismiss, in its entirety, and allowed the Receiver to continue with his Receiver Litigation. (D&O Doc. 42).

The written discovery to date has been extensive and substantial. As a number of documents in this case were considered privileged and confidential, the Receiver and Individual Defendants negotiated and agreed to a protective order concerning the treatment, use, and protection of said documents. (Doc. 38). Ultimately, after numerous meet and confer discovery conferences, and numerous discovery dispute letters, the Receiver ultimately produced over 1.7 million documents to the Individual Defendants. (D&O Doc. 52, p. 2). The Individual Defendants for their part produced approximately 10,000 documents that their counsel identified as responsive and not privileged as to the Receiver.  At the time the parties reached an agreement in principle to settle the case, there were pending disputes concerning additional document production and other discovery.

One such dispute led the Receiver to file a motion to compel on January 14, 2022.  (D&O Doc. 52) (the "Motion to Compel"). In response to the Motion to Compel, the Individual Defendants contended that a production of the requested documents would be an undue burden and extreme cost to their clients. Specifically, counsel for the Individual Defendants informed the Court that it had "incurred nearly half a million dollars in legal fees" to review for relevance and privilege and produce documents thus far, and that it estimated it would take "approximately 2,872 hours and cost approximately $1,775,872" to review the remaining document requested by the Receiver.  (Receiver's Action, Doc. 56, p. 18, ¶ 44 (emphasis added)).

**e. Motion to Monitor Proceeds, the D&O Policies, and Court-Ordered Mediation:**

Due to the response to the Receiver's Motion to Compel highlighting the expense of the case, which was reducing the amount of insurance available under the subject D&O Policies (as defined below), on March 10, 2022 the Receiver filed his motion to monitor the proceeds of the subject D&O Policies. (Doc. 498, the "Monitor Motion"). In the Monitor Motion, the Receiver moved the Court to monitor and review requested payments under the subject D&O Policies by establishing a Court-approved process to monitor and approve the Receiver's requests for payment and reimbursement. (*Id* at 1).

As the Court is aware, the subject D&O Policies concern several policies ECA purchased for the benefit of ECA, as well as the directors and officers of ECA (including the Individual Defendants). On September 3, 2018, AIG Specialty Insurance Company ("AIG") issued a Directors & Officers Liability Insurance, Employment Practices Liability Insurance, and Fiduciary Liability Insurance Policy No. 01-825-10-59, (the "Policy") to ECA. (Doc. 133, at Exhibit A.; Doc. 374-1). Certain other insurers issued excess Directors & Officers Liability Insurance policies to ECA bearing Policy Nos. 1000059620181 ("Starr", Doc. 374-2); MLX 7602784-00 ("Argonaut", Doc. 374-3); MPL 0183905-03 ("Zurich", Doc. 374-4); XMF 1802431 ("Nationwide", Doc. 374-5); ELU 157380-18 ("XL", Doc. 374-6); MKLM6MXM000022 ("Markel", Doc. 374-7); and 01-871-22-13 ("National Union", Doc. 374-8) (these policies, collectively with the Policy, are the "D&O Policies"; the proceeds of the D&O Policies are the "Proceeds"; AIG, Star, Argonaut, Zurich, Nationwide, XL, Markel, and National Union are collectively referred to as the "D&O Insurers"). The D&O Policies initially covered claims made (or deemed to have been made) between September 3, 2018 and September 3, 2019, but ECA,

while in the Receivership Estate, purchased run-off (or tail) endorsements/coverage that extended the claims-made period by six (6) years.

Subject to their respective terms and conditions, the D&O Policies afford $81 million in coverage, with the first $50 million generally affording coverage for both (i) ECA's officers and directors and (ii) ECA (defined in the Settlement Agreement as "Side A&B Coverage"), and the next $31 million affording coverage only for the ECA's officers and directors (defined in the Settlement Agreement as "Side A Coverage").

The Court held an in-person hearing concerning the Receiver's Monitor Motion on June 10, 2022. (Doc. 515). During this hearing, the Court indicated that the Parties should meet and confer regarding scheduling of and attending another mediation regarding the Receiver's Claims and the Receiver Litigation. After several weeks of discussions between the Parties, , and at the recommendation of the Court, the Parties jointly moved the Court to Order a mediation between the Parties, as well as to stay the Receiver Litigation to conserve proceeds of the D&O Policies in the meantime through the time allowed to mediate the Receiver Litigation. (Doc. 519). Additionally, the Receiver agreed to withdraw the Monitor Motion, without prejudice, if the Parties were going to attend a good-faith mediation. (*Id*). On July 11, 2022, the Court entered an Order allowing the Receiver to withdraw his Monitor Motion, and ordered the Parties to attend a third mediation. (Doc. 520).

### f.  **The Monroe Litigation:**

Monroe Capital also participated in the mediation concerning Monroe Capital's claims. On February 27, 2020, Monroe initiated a lawsuit in the Law Division of the Circuit Court of Cook County, Illinois, (the "Chicago Court"), Civil Action No. 2020-L-002475, asserting claims against the Individual Defendants, Willis Stein, and certain other defendants seeking to recoup losses

relating to its 2015 investment of $72 million in ECA (the "Monroe Litigation"). That action, which remains pending in the Chicago Court, would be resolved by the settlement here.

### g.  Terms of the Settlement:

Following the Court's Order to attend mediation (Doc. 520), the Parties agreed to mediate the Receiver Litigation , the Monroe Litigation, and other issues, with Mediator Lawrence Pollack of JAMS Mediation. Mr. Pollack is on the national board of JAMS, and although he resides in New York, agreed to conduct an in-person mediation in Atlanta, Georgia. (Schutz Aff., ¶ 28). The mediation was held on August 17, 2022. (Schutz Aff., ¶ 28).

The mediation did not initially result in a successful resolution of the outstanding issues. However, after weeks of post-mediation negotiations and discussions, a settlement framework was agreed to on September 10, 2022. Due to the complexity of the issues, and the numerous Parties involved, the Settlement document was finally agreed to on December 16, 2022. The key provisions of the Settlement Agreement include, but are not limited to, the following:

- Within 30 days of the execution of the Settlement Agreement, the Receiver would file a motion with the Receivership Court to approve and confirm the Settlement Agreement. (Settlement Agreement, p. 7).

- Essential terms of an order from the Receivership Court approving the Settlement Agreement are that:

   o All Side A&B Coverage of the D&O Policies will be exhausted by the payment of the Settlement Payment and receipt by counsel for the Individual Defendants and ECA of costs and fees incurred prior to the approval of the Settlement Agreement; (Settlement Agreement, p. 7).

o   Any remaining Side A Coverage is not an asset of the Receivership Estate, and the Individual Defendants may draw on the Side A Coverage in accordance with the terms and conditions of the relevant policies without approval from the Receivership Court. (Settlement Agreement, p. 7).

o   The Court will enter a bar order containing an injunction and permanent bar of the prosecution against Individual Defendants, or any of their representatives, affiliates, insurers, or attorneys, of any and all claims of any kind and nature, including direct, indirect, or derivative claims in regard to any and all matters arising out of or in any way related to ECA or ECA's operations, including without limitation, claims asserted by any former student or employee of ECA, and any other ECA creditor or shareholder. (the "Bar Order").

-   Within 15 business days of the Court confirming the Settlement Agreement, and the resolution of any appeals, and subject to receipt by the D&O Insurers of the Required Withholding Information and to receipt by the D&O Insurers of the Required Withholding Information and all payment instructions from the Receiver at least ten (10) business days prior to that funding deadline, the D&O Insurers will remit the Settlement Payment of twenty-eight million United States Dollars ($28,000,000.00) in cash to the Receiver, by wire or check, for the benefit of the Receivership Estate of ECA. (Settlement Agreement, p. 8).

-   Within five (5) business days of receiving the Settlement Payment, the Receiver and the Individual Defendants will jointly move to dismiss the Receiver Litigation, with *prejudice*, and would additionally release the Individual Defendants from any and all claims related to ECA or the Receivership Estate. (Settlement Agreement, p. 9).

- Within five (5) business days of the Receiver receiving the Settlement Payment, the parties to the Monroe Litigation will jointly move to dismiss that case with *prejudice* with each party to bear their own fees and costs, and each of those parties additionally will release each other from any and all claims related to ECA or the Receivership Estate. (Settlement Agreement, p. 9).

- In consideration for the Settlement Amount, the Receiver agreed to release and discharge any and all claims against the Individual Defendants related in any way to ECA or the Receivership Estate, and any and all claims against Monroe related in any way to ECA or the Receivership Estate. (Settlement Agreement, pp. 9-10).

- However, the Receiver expressly did not waive or release any claim or defense the Receiver may have for any of the Parties' asserted proof of claims in the Receivership Estate, and for the avoidance of doubt, did not affirm, acknowledge, or confirm any of the proofs of claims submitted by any of the Parties in the Receivership Estate. (Settlement Agreement, pp. 10-11).

### III.     DISCUSSION

The Receiver, with the joint consent of the other Parties, moves this Court to confirm and approve the terms of the Settlement Agreement to allow the Receivership Estate to receive $28,000,000.00. The Receivership Estate receiving the $28 million is completely contingent on this Court entering an order to confirm and approve the Settlement Agreement, including the essential terms of the bar order and additional terms. In support of the requested relief herein, the Receiver moves the Court as follows:

1. __The Settlement Agreement should be approved:__

The Settlement Agreement, including the Settlement Payment and other essential terms, is fair and reasonable and should be confirmed. As an initial matter, it should be noted that "[t]he district court has broad powers and wide discretion to determine relief in an equity receivership." *Sec. & Exch. Comm'n v. Alleca*, No. 1:12-CV-3261-WSD, 2018 WL 2278258, at *3 (N.D. Ga. May 18, 2018)(quoting *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *see also S.E.C. v. Kaleta*, 530 Fed.Appx. 360, 362 (5th Cir. 2013). Such discretion includes the approval and confirmation of settlements. The ultimate issue is whether the proposed settlement is fair, reasonable, and adequate. *Faught v. Am. Home Shield Corp.,* 668 F.3d 1233, 1240 (11th Cir.2011); *Newman v. Sun Cap., Inc.*, No. 2:09-CV-445-FTM-29, 2012 WL 3715150, at *10 (M.D. Fla. Aug. 28, 2012)

There are several factors courts use to evaluate whether a proposed settlement is fair, reasonable, and adequate. In *Sterling*, the Eleventh Circuit noted that trial courts should examine six factors in evaluating whether a settlement is fair. *Sterling*, 158 F.3d at 1202, n. 6. Those factors are:

> (1) the likelihood of success; (2) the range of possible discovery; (3) the point on or below the range of discovery at which settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Id; Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984)). These *Sterling* factors have often been applied to review and evaluate settlements in the context of class actions. *Id.* Although this case does not involve a class action, the Court may apply the standard developed in the context of class actions for review of the proposed Settlement Agreement. *Newman v. Sun Cap., Inc.*, No. 2:09-CV-445-FTM-29, 2012 WL 3715150, at *10 (M.D. Fla. Aug. 28, 2012) (applying the

standard to approve a class action settlement in a motion by the court-appointed receiver to approve and confirm a settlement). Ultimately, determining the fairness of a settlement, including in the context of a receivership, is "left to the sound discretion of the trial court [. . . .]" *Sterling*, 158 F.3d at 1202 (quoting *Bennett,* 737 F.2d at 986); *Christo v. Padgett,* 223 F.3d 1324, 1335 (11th Cir.2000); *Leverso v. Southtrust Bank,* 18 F.3d 1527, 1531 (11th Cir.1994).

These factors are discussed in turn below.

### a.  **No Collusion Between the Parties:**

As an initial matter, it is important to note that there has not been any collusion between the Parties, or the counsel for the Parties in agreeing to the Settlement Agreement. In determining whether to approve a proposed settlement, the cardinal rule is that a district court must find that the settlement is fair, adequate and reasonable and "is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). "There is a presumption of good faith in the negotiation process.... Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion.... Further, where the case proceeds adversarially, this counsels against a finding of collusion." *Gunthert v. Bankers Standard Ins. Co.*, No. 5:16-CV-00021-MTT, 2019 WL 1103408, at *3 (M.D. Ga. Mar. 8, 2019); *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) (citations omitted); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001).

Here, there can be no legitimate claim of fraud or collusion between the Parties. As the Court is well aware, this litigation and settlement process has been a hard-fought, and aggressively litigated matter, with capable and experienced counsel for all sides. The Settlement Agreement, and Settlement Payment, is a product of three mediations, which included one pre-suit mediation. Although counsel for the Parties have acted professionally and ethically towards one another, there

is no scintilla of collusion between counsel. That is highlighted throughout the background section mentioned above. The Receiver previously brought a good-faith discovery dispute to the Court concerning the Individual Defendants' objections to the Receiver's discovery request. (D&O Doc. 52). Additionally, the Receiver moved the Court to enter an order restricting and limiting the Individual Defendants' counsel's hourly rates. (Doc. 498). Based on these facts alone, there is no legitimate allegation, or presumption, that there was any collusion between the Parties regarding the Settlement. Thus, there is a presumption that the Settlement is fair and reasonable.

It is important to remember that this is a settlement, not a windfall for any Party. "Neither should it be forgotten that compromise is the essence of a settlement." *Cotton*, 559 F.2d at 1330. Part of compromise is the inherent principle of the "yielding of absolutes and an abandoning of highest hopes." *Id* (quoting Milstein v. Werner, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). Even though the Settlement Agreement, and the Settlement Payment, is a compromise, and all parties yielded to reach that compromise, the process that led to the compromise makes clear that there is no evidence of collusion.

As there is no reasonable or legitimate evidence of collusion, the Receiver now addresses the six *Sterling* factors.

**b.  Likelihood of Success at Trial:**

Concerning the first *Sterling* factor, here, the likelihood of success at trial at best can be defined as uncertain. The Receiver has survived the Individual Defendants' first dispositive motion, the Motion to Dismiss, and has proceeded to discovery.  The Individual Defendants have raised a number of affirmative and other defenses, which remain the subject of ongoing discovery. (Doc. 48.)  It is possible, although not certain, that if the Receiver Litigation were to continue it would result in a jury trial given the Court's indication of possible disputed facts. (*See* Doc. 42, p.

16

24 ("Whether Defendants' [alleged] decisions to ignore the teach-out related warnings will be shielded by the business judgment rule may very well be something that a jury has to answer.")).

Of course, jury trials are the epitome of uncertainty. *Thompson v. State Farm Fire & Cas. Co.*, No. 5:14-CV-00032 (MTT), 2019 WL 13076640, at *4 (M.D. Ga. Jan. 14, 2019); *Perez v. Asurion Corp.*, 501 F.Supp.2d 1360, 1381 (S.D. Fla. 2007) ("With the uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear."). And settlements provide speedy, substantial, certain, and complete, relief to the damages of plaintiffs while avoiding the uncertainty, and expense, of protracted litigation and trials. *Thompson,* 2019 WL 13076640, at 4*.

Given the Receiver's success to date in the proceeding, but the inherent uncertainties at trial, the Receiver believes his success at trial is favorable, but uncertain. (Schutz Aff., ¶ 32).

**c.   <u>Range of Possible Recovery</u>**:

The possible range of recovery for the Receiver Litigation is wide, and disputed. The Receiver contends that his damages are related to the failure of a $400 million annual revenue company, ECA, as well as the pending closed-school loan discharges pending against ECA, which are estimated to be more than $50 million currently, and may eventually total over hundreds of millions. (*See* Doc. 1).   Of course, the Individual Defendants dispute the liability for these damages, in addition to the calculation of these damages. Accordingly, the possible damages in this matter range from $0 if the claims are unsuccessful, to $50 million if certain of the Receiver's damages theories are accepted, to over half a billion (Doc. 42, p. 12), if the Receiver were to prevail on all its claims and theories of recovery.

As noted above, the D&O Policies provide a potential source of recovery for the Receiver's Claims. The Court is also aware that the D&O Policies are eroding each day this litigation, and the

other auxiliary pieces of litigation, are continuing.  While those D&O Policies originally provided up to $81 million of coverage, that coverage has been eroding from payments made in arbitrations involving ECA and the Individual Defendants, and from the expenses associated with the Receiver Litigation, the Monroe Litigation, and other pending litigation.

As noted in the Receiver's Monitor Motion, and a subsequent in-person hearing on said motion, before the Settlement Agreement was agreed to, the D&O Policies issued by both AIG and Starr had been fully exhausted due to defense costs and expenses, as well as previously paid settlements. (Doc. 498, pp. 14-15). Additionally, it is estimated that Argonaut Insurance Company, the third insurer in the stack, will have had a substantial amount of its proceeds exhausted before the payment of the Settlement Amount. Accordingly, the best possible recovery provided by the remaining proceeds of the D&O Policies is approximately $25 million remaining in Side A&B Coverage, and the remaining $30 million of Side A Coverage– totaling approximately $55 million of insurance proceeds. Due to the fact that the D&O Policies are eroding policies, the longer the Receiver Litigation, as well as the Monroe Litigation continues, the more the D&O Policies will dwindle, thus reducing the amount readily available to pay a judgment, or settlement, of the Receiver.

d. **Range of Possible Recovery at Which a Settlement is Fair, Adequate, and Reasonable:**

The proposed Settlement is fair and reasonable. "The second and third considerations of the [*Sterling* factors] test are easily combined." *Behrens,* 118 F.R.D. at 541; *Perez*, 501 F. Supp. 2d at 1380. A district court must first determine the appropriate standard of damages (as in step two - in order to calculate the range of recovery), and then determine where in this range of recovery, a fair, adequate and reasonable settlement amount lies. *Perez*, 501 F. Supp. 2d at 1380.

As noted, the Receiver estimates alleged damages to be between $50 million and potentially half a billion dollars. These damage estimates, however, are extremely contested and disputed. As noted above, there is only approximately $55 million of applicable insurance coverage remaining to pay a potential judgment or settlement. Accordingly, a settlement of $28 million, or 70% of the low range of the estimated damages, is reasonable considering the disputed claims, damages, and remaining available insurance proceeds. Furthermore, although the parties dispute the merit of the Individual Defendants' defenses, "[t]he existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Perez*, 501 F. Supp. 2d at 1380.

Ultimately, the Court "may rely upon the judgment of experienced counsel for the parties.... Absent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" *Gunthert v. Bankers Standard Ins. Co.*, No. 5:16-CV-00021-MTT, 2019 WL 1103408, at *4 (M.D. Ga. Mar. 8, 2019); *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) (quoting *Cotton*, 559 F.2d at 1330); *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 632 (11th Cir. 2015) (same); *In re Domestic Air*, 148 F.R.D. at 312-13 (same). Here, the Receiver's Counsel, and counsel for the other Parties, recommend that the Settlement Agreement is fair and reasonable. (Schutz Aff., ¶ 32). In fact, Robins Kaplan, one of the Receiver's co-counsel, represented the bankruptcy trustee in an action against the former directors and officers of the for-profit college Corinthian, and helped secure over $16 million in a settlement against said directors and officers. (Schutz Aff., ¶ 6). At $28 million, the Receiver, and the Receiver's Counsel, have helped secure an even better recovery for the Receivership Estate than previously obtained in the Corinthian bankruptcy. Given the Receiver's counsels' experience, including direct experience in litigation concerning for-profit colleges, the Court has ample

evidence to rely on the counsel's judgment that the Settlement Agreement is fair, adequate, and reasonable.

Further, Monroe, a presumed secured creditor and certainly the most active creditor in the Receivership Estate, has agreed to dismiss its Chicago litigation as part of the Settlement Agreement in order to maximize the recovery to the Receivership Estate (and potentially its own claim). A settlement of the Monroe Litigation was a condition precedent to settling the Receiver's claims against the Individual Defendants, as the Individual Defendants had asserted a right of defense against the D&O policies. The fact that Monroe has agreed to forgo its litigation in Chicago in order to allow the Receivership Estate to recover the $28 million in settlement proceeds speaks volumes as Monroe's views of the reasonableness of the settlement.

   e.   **<u>Anticipated Complexity, Expense, and Duration of Litigation:</u>**

"The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigation." *Perez*, 501 F. Supp. 2d at 1381. Moreover, what the Eleventh Circuit stated regarding settlements nearly three decades ago applies with even more force here: "In these days of increasing congestion within the Federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources." *Cotton,* 559 F.2d at 1331.

It is undisputed that the Receiver's Claims are complex. The Receiver's Claims concern breaches of fiduciary duties under Delaware law. (Doc. 42, p. 16). It is undisputed that this Settlement Agreement has been the subject of protracted negotiations over multiple years, and that if the Settlement Agreement is not confirmed, any potential recovery would be even longer delayed, if ever realized. ECA was placed into a federal Receivership, and the Receiver was appointed on November 14, 2018 (Doc. 26). The Receiver has been pursuing his claims against

the Individual Defendants since the fall of 2019, first through pre-suit negotiations and mediations, and finally through the filing of the Receiver Litigation in March of 2021. If the Settlement Agreement is not confirmed, recovery by any means will require additional years of litigation involving numerous expert witnesses, extensive motion practice, hearings, and appeals. (Schutz Aff., ¶ 35).

Moreover, continued litigation of the Receiver's Claims would require significant time and expenses for the Parties over the course of several years, not to mention the consumption of significant judicial resources. (Schutz Aff., ¶ 33); *see CHIS, LLC v. Peerless Indem. Ins. Co.*, No. 5:14-CV-277-MTT, 2016 WL 9185305, at *3 (M.D. Ga. Nov. 17, 2016); s*ee In re U.S. Oil and Gas Litig.*, 967 F.2d at 493 (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive"); *Saccoccio*, 297 F.R.D. at 693-94; *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002). In contrast, the proposed Settlement Agreement provides speedy resolution, and a substantial amount of cash for the Receivership Estate, while avoiding the expense and time associated with protracted litigation.

Lastly, it is undisputed that continued litigation would be expensive. To date, the Receiver has produced over 1.7 million pages of documents and emails. There is a pending discovery dispute, that if the Receiver is successful, will require the Individual Defendants to produce hundreds of thousands of additional documents beyond the tens of thousands of documents they have already reviewed and produced. Further litigation will require numerous depositions and additional written and electronic discovery. Further litigation will also likely require experts in teach-out analysis, the for-profit college regulatory environment, solvency and restructuring analysis, and damage calculations. All of these discovery issues are expensive, and would be

required to be reimbursed out of any judgment if the Receiver were to succeed on his claims.  *See In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 325 (N.D. Ga. 1993)(noting that complex litigation and discovery with "more than one and a half million pages of documents [. . .] would be time consuming, complex, and expensive."). If the Settlement Agreement is confirmed now, those expenses will not be incurred, which means that more funds can be provided for a potential distribution to the Receivership Estate's creditors.

Additionally, it is presumed that the case would not conclude at trial, but would likely continue with appellate proceedings, and any continued litigation would continue to erode the D&O Policies due to defense costs. (Schutz Aff., ¶ 35). The uncertainties of pursuing a trial and appeal, the complexity and duration of the litigation, and the expenses incurred to date, as well as expenses to be incurred if the matter does not settle, illustrate that "the benefits of a settlement are clear." *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007).

### f. <u>Opposition to the Settlement:</u>

Any opposition to the Settlement should be overruled in favor of the Settlement. Courts should "examine the settlement in light of the objections raised and set forth on the record reasoned responses to the objections including findings of facts and conclusions of law necessary to support the response." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 326; *Cotton,* 559 F.2d at 1331.

Any opposition to the Settlement Agreement is likely based on speculation. Complaints that a far greater settlement was possible, or that another plaintiff, or law firm, could have achieved a better result are "at best speculative." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 904 (5th Cir. 2019)(noting that objectors to the proposed settlement that contend they could have achieved a better result than that the receiver's proposed settlement were unsupported and

speculative). As the Fifth Circuit in *Zacarias* noted, there is "no certainty in the outcome" of litigation. 945 F.3d at 904. Further, it important to note that two of the presumed secured creditors of the Receivership Estate have agreed to the Settlement Agreement – Monroe and Willis Stein. (*See* Settlement Agreement).

Ultimately, for the reasons addressed above, the Settlement Agreement is fair and reasonable. If the Settlement Agreement is not approved and confirmed, the Individual Defendants will continue to defend the Receiver Litigation, and no funds would be brought into the Receivership Estate unless the Receiver is successful at a later unidentified date, and likely after trial. Simply put, without approval of the Settlement Agreement, the Receivership Estate will not receive $28 million, and the Receiver will not have a pool of money to distribute to the potential creditors based on their alleged proof of claims and priority. Approval of the Settlement Agreement is in the best interest of the Receivership Estate, and it should be approved.

**g.**   **The Stage of the Proceedings**:

The current procedural posture of the Receiver Litigation demonstrates that the Settlement Agreement is fair and reasonable. A court evaluates the stage of the proceedings at the time of settlement to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation. *See Behrens,* 118 F.R.D. at 544; *Perez*, 501 F. Supp. 2d at 1383.

The Receiver Litigation has been pending with the Court for over 19 months, but the Parties have been negotiating and informally litigating this matter since early 2020. The Settlement was agreed to after three mediations, and after the Receiver survived an extensive Motion to Dismiss filed by the Individual Defendants. Substantial written discovery, between the Parties and non-

parties, has already commenced, with further discovery disputes to be resolved. Depositions have not been conducted, but if they are, they will be numerous.

Based on the amount of work that has already been completed in this case, and the sheer passage of time, the Parties are "well aware of the other side's position and the merits thereof" when the settlement negotiations commenced. *In re Sunbeam Sec. Litig.,* 176 F.Supp.2d at 1332. Given this passage of time, and the understanding by all Parties of the nature of the Receiver's claims and the Individual Defendants' defenses, the fact that the Settlement Agreement is being brought forth now for the Court's review demonstrates that this is a fair and reasonable time to confirm this Settlement Agreement. Each Party knows their case and has done a substantial amount of work to arrive at the Settlement Agreement.

Based on the reasons articulated above, the Settlement Agreement, and the essential terms of the Settlement Agreement, are fair, reasonable, and adequate. The Receiver moves this Court to confirm the Settlement Agreement.

**2.**  **The Court Should Enter a Bar Order as an Essential Term of the Settlement Agreement**:

In addition to confirming the Settlement Agreement, and all of the terms included therein, the Receiver and the Parties specifically move the Court to issue a bar order concerning any pending or future claims against the Individual Defendants which are substantially similar to the Receiver's claims.

A bar order can be an extraordinary remedy as it can bar a third party's claim. *Sec. & Exch. Comm'n v. Quiros*, 966 F.3d 1195, 1199 (11th Cir. 2020). The Eleventh Circuit has noted that bar orders should be entered "cautiously and infrequently and only where essential, fair, and equitable." *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1079 (11th Cir. 2015). To approve a bar order, a district court must determine if the bar order is fair and equitable. *Sec. &*

*Exch. Comm'n v. Alleca*, No. 1:12-CV-03261-ELR, 2021 WL 4843987, at *12 (N.D. Ga. Sept. 9, 2021); *See Munford v. Munford Inc. (In re Munford)*, 97 F.3d 449, 455 (11th Cir. 1996).

A bar order can be entered if it is essential, meaning it is "integral to settlement" and only when the settling defendant "would not have entered into the settlement in the absence of such bar order." *Quiros*, 966 F.3d at 1199; *See In re Seaside*, 780 F.3d at 1078; *In re Munford*, 97 F.3d at 455. Here, as an initial matter, it is clear that a bar order is essential to the terms of the Settlement Agreement. The expressed language within the Settlement Agreement make the entire settlement, including the Receivership Estate receiving $28 million, contingent on the Court issuing and entering a bar order. (Settlement Agreement, pp. 7-9). Accordingly, based on the clear language of the Settlement Agreement, the issuance and entry of the Bar Order is an essential term of the Settlement Agreement.

Bar orders can enjoin and foreclose pending and future suits against the defendants a receiver is also in engaged in litigation with. *Zacarias*, 945 F.3d at 897; *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (unpublished). Courts may enter bar orders for claims that are "substantially similar" to the subject receiver's claims, or claims and actions that involve and interfere with assets of a federal receivership.  Federal courts have equitable powers to enjoin or bar claims, even those held by a troubled entity's investors, that are "substantially identical" to those bought by a federal receiver. *Zacarias*, 945 F.3d at 898; *SEC v. DeYoung,* 850 F.3d 1172, 1176-83 (10th Cir. 2017). In *DeYoung*, the receiver sued and settled the receiverships' claims against a third party. 850 F.3d 1175. As part of the settlement, the receiver sought a bar order that would enjoin ongoing and future suits by non-parties to the settlement against the third party. *Id.* at 1178. The district court entered the bar order, and the non-parties appealed asserting that their claims were individual, distinct, and separate from the receiver's claims. *Id.* at 1180-81. The non-

parties further asserted that the receiver did not have standing to assert their "exclusive" claims, therefore, the receiver could not bar their claims. *Id.* The Tenth Circuit upheld the bar as the non-parties' claims and the receiver's claims "were said to be 'substantially identical' because they involved 'the same loss, from the same entities, related to the same conduct, and arising out of the same transactions and occurrences by the same actors.'" *Zacarias*, 945 F.3d at 898 (quoting *DeYoung,* 850 F.3d at 1176).

Likewise, the Fifth Circuit, in *Zacarias*, enjoined third-party claims as they held that those claims were substantially similar to the receiver's claims as they involved "the same loss, from the same entities, related to the same conduct, and arising out of the same transactions and occurrences by the same actors." 945 F.3d at 898.

The Settlement Agreement contemplates that this Court will issue an order which enters the Bar Order. (Settlement Agreement, p. 7-8). The Bar Order would enjoin and issue a permanent bar of the prosecution of claims against the Individual Defendants that are substantially similar to the Receiver's Claims - claims against the Individual Defendants that arise out of or are related to ECA or ECA's operations. (*Id*). Accordingly, the Bar Order would bar claims that involve the same loss, same parties, related to the same conduct, and arise out of the same transactions as the Receiver's Claims. For these reasons, the Receiver moves the Court to exert its inherent authority and equitable powers concerning federal receivership to enter the Bar Order as requested in the Settlement Agreement for any pending or future claim that is substantially similar to the Receiver's Claims.[6]

---

The Bar Order would not violate the Anti-Injunction Act.  Under the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."28 U.S.C.A. § 2283; *Zacarias*, 945 F.3d at 902–03.

There are three exceptions to the Anti-Injunction Act:"(1) as expressly authorized by Act of Congress; (2) where necessary in aid of its jurisdiction; or (3) to protect or effectuate its judgments." *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1249 (11th Cir. 2006);  28 U.S.C. § 2283; *Est. of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011). The United States Supreme Court has noted held that "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Zacarias*, 945 F.3d at 902 (quoting *Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 295, 90 S. Ct. 1739, 1747, 26 L. Ed. 2d 234 (1970)). Guided by principles of federalism, the Fifth Circuit has noted that "[there is] a threat to the [receivership court's] jurisdiction" where "a state proceeding threatens to dispose of property that forms the basis for federal *in rem* jurisdiction." *Zacarias*, 945 F.3d at 902; *Newby v. Enron Corp.*, 302 F.3d 295, 301 (5th Cir. 2002). The "necessary in aid of its jurisdiction" exception provides the basis for an injunction "[w]hen particular property is before the district court ... such as when it is the subject of an *in rem* proceeding or in the custody of a bankruptcy trustee[.]" *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1103 (11th Cir.2004); *Burr & Forman v. Blair*, 470 F.3d 1019, 1031–32 (11th Cir. 2006).

The Fifth Circuit's holding in *Zacarias* is, again, directly applicable and similar to the facts at hand. In *Zacarias*, the court-appointed receiver over Ponzi-scheme entities secured a settlement

with two non-parties for complete peace that was conditioned on a court-ordered bar order enjoining future Ponzi-scheme related suits from being filed against the two non-parties. 945 F.3d at 889. The receiver moved the district court to enjoin any pending and future related claims against non-parties in order to receive $132 million as part of the settlement. *Id* at 890-892. The district court approved the bar order and barred claims which were "substantially similar" to the receiver's claims. *Id* at 898.

The Fifth Circuit approved the bar order on pending and future claims after a thorough analysis of the claims and the objections. The Court noted that the bar order did not violate the Anti-Injunction Act as the objections to the settlement were interfering with an asset of the receivership estate – a $132 million **receivable owed to the receivership that was conditioned on the bar order being approved**. *Id* at 903 (emphasis added).

Here, it is undisputed that the Receivership Court exercises jurisdiction over the Receivership Estate. The Court has *in rem* jurisdiction over the Receivership Entities and the Receivership Property. (Doc. 26; s*ee also* Doc. 104, p. 2). The Court has clearly authorized the Receiver to assert causes of action of ECA that are Receivership property "or related thereto, to maintain in the Receiver's name or in the name of ECA any action to enforce any right, claim, or chose in action, and to intervene inactions in which ECA is a party for the purpose of exercising the powers under this Order[.]" (*Appointment Order,* Doc. 26, p. 5, ¶ 4.) The Court also authorized the Receiver to "pursue in the name of the Receiver for the benefit of the Receivership Estate any claim that may be asserted by any creditor of ECA [. . . .]" *Id.* at p. 6, ¶ 7. That is what the Receiver has done:  he has asserted claims against the Individual Defendants to recover funds to distribute to the Receivership Estate's potential creditors.

Due to the Receiver's efforts, the Receivership Estate stands to gain a new asset that the Court should seek to protect – the Settlement Payment. Similar to *Zacarias,* the Receivership Estate stands to gain a *res* in the form of a $28 million receivable owed to the Receivership Estate, receipt of which is conditioned upon the entry of the Bar Order.  The Court may enter the Bar Order to protect and aid its jurisdiction to protect the Settlement Payment without violating the Anti-Injunction Act.

   3.  **Approval Process for the Settlement Agreement and entry of the Bar Order:**

The Receiver is filing this motion to seek the confirmation and affirmation of the Settlement Agreement, and to comply with any and all due process concerning the Settlement Agreement and the Bar Order.

Due process requires notice and an opportunity to be heard. *Cleveland Bd. Of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985); *Greene v. Lindsey,* 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982). Due process essentially requires that the procedures be fair. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The process that is due varies according to the nature of the right and to the type of proceedings. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)

The Fifth Circuit has held "[a]ll due process has been afforded" examining facts similar to the facts at hand. *Zacarias*, 945 F.3d at 903(holding that all due process was awarded to objecting creditors to a receiver's third party bar order where the objecting creditors: 1) received notice of the claims process: 2) participated in that receivership's claims process: 3) any recovery through the claims process awarded them a recovery on their alleged claim the objecting creditors sought

to not have barred: 4) received notice of the potential settlement by the receiver: and 5) were given an opportunity to be heard on the proposed settlement and bar order. ).

The Receiver has already complied with the notice requirements for this Court's Claims Process. (Doc. 180). Such requirements have included, but are not limited to:[7] 1) publishing a Notice to File Claim with *USA Today* (Doc. 175, p. 3); 2) posting a link to Omni Management and the Claims Process on ECA's website; 3) sending postcards to students who attended ECA's schools from January 1, 2017 - December 31, 2018 (Doc. 175, pp. 2-3); 4) transmitting the Notice Packages to employees of ECA, both current and former, at their last email and/or cell phone number of record (Doc. 175, p. 3); and 5) mailing the Claims Package to vendors, trade creditors, secured lenders, government, regulatory, and accreditor entitles at their last address of record (Doc. 175, p. 3).

Any potential interested parties will also be given ample due process concerning the confirmation of the Settlement Agreement. First, any interested parties will be given an opportunity to review the Settlement Agreement by the mere fact that this confirmation motion is being filed with the Court on a public docket, and the Settlement Agreement is attached as Exhibit A. Second, the Parties agreed in the Settlement Agreement that they would provide notice of that Parties' motion to confirm the Settlement Agreement and the entry of a Bar Order to all parties that filed a claim against the Receivership Estate, or who the Receiver believes may have a potential interest in the Settlement Agreement. (Settlement Agreement, p. 3). Attached as **EXHIBIT E** is the Claim Bar Notice the Parties have agreed to send out, and the Receiver will file a certificate of service when said Claim Bar Notice has been sent. Third, the Receiver, and the Parties, move the Court to set a hearing date regarding the confirmation of the Settlement

---

[7] All capitalized terms in this sentence are defined in the Court's Order (Doc. 175).

Agreement and issuance of a Bar Order to allow all parties an opportunity to be heard concerning this relief sought in this Motion. Specifically, based on the Court's soonest availability, the Receiver moves the Court to set a hearing date on this Motion for January 3, 2023.

By complying with the above, all due process will be afforded to all interested parties and potential objectors concerning the relief sought in this Motion.

## IV.   CONCLUSION

The Receiver, and the other Parties to the Settlement Agreement, move the Court to enter an order in similar fashion to the proposed order attached as **Exhibit F.** The proposed order memorializes the essential terms of the Settlement Agreement as discussed above, including, but not limited to, the entry of the Bar Order, and a finding of fact that the Side A&B coverage provided under  the D&O Policies is exhausted upon the Receiver's receipt of the Settlement Payment, and receipt by defense counsel for the Individual Defendants and ECA of costs and fees incurred prior to approval of the Settlement Agreement.

The Receiver moves the Court to enter such an order, because without said order, the Receivership Estate does not receive $28 million that can be put toward paying the creditors of ECA through the Claims Process. For this reason, and the other reasons addressed above, the Receiver moves the Court to confirm and approve the Settlement Agreement and to grant an order similar in substance to Exhibit F.

Respectfully submitted this the 19th day of December, 2022.

*/s/ James F. Banter*
James F. Banter
Georgia Bar: 581797
Counsel for the Receiver

JAMES, BATES, BRANNAN, GROOVER LLP
231 Riverside Drive
Macon, Georgia 31201

Phone 478/749-9992
Fax 478/742-8720
jbanter@jamesbatesllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy on the following parties via U.S. Mail or electronically through the CM/ECF system on this the 19th of December, 2022.

*/s/ James F. Banter*
James F. Banter
Counsel for the Receiver
